## 37948. ALLEN v. THE STATE.

HILL, Presiding Justice.

Stanley Edward Allen was tried by a jury and convicted of the murder, robbery and rape of Susie C. Rucker. He was sentenced to death for the murder,[1] life imprisonment for the rape, and 20 years imprisonment for the robbery.

The defendant made a statement to the police which was entered into evidence.[2] He also testified at trial and his testimony was essentially the same as his statement to police. According to the defendant, on Monday, January 5, 1981, he was with 18-year-old Woodrow Davis at his (the defendant's) cousin's place when Davis borrowed his car at about 10 p.m. Davis returned with the car at about 10:30 p.m. and said "Stanley, come on and go with me, we got something to do." As they drove, Davis told him he knew an old lady who had plenty of money and he was going to get some of it. They

---

[1] This case was tried pursuant to the Unified Appeal Procedure, 246 Ga. at A-5, and has been reviewed pursuant to that procedure. Id. at A-16 (IV) (B) (2).

[2] The trial court admitted the statement over the defendant's objection that there was no showing that it was freely and voluntarily made in that neither of the law enforcement officers who interrogated the defendant advised him what he was suspected of or would be charged with. Both the officers involved in the interrogation testified that the statement was freely and voluntarily made after the defendant was advised of his rights and advised that he was being questioned in connection with the investigation of the murder of Mrs. Rucker. Defendant enumerates no error on appeal regarding the admission of his statement, and we find none.

went to the victim's home, where Davis knocked on the door and said that he was Elijah Hunter (Elijah Hunter was a neighbor of the victim's) and was out of gas. She responded that he wasn't Elijah Hunter. After she went into the bedroom and came out with a gun (either a rifle or a shotgun), Davis and the defendant ran back to the car and left. The defendant returned to his cousin's, arriving about 11 p.m., and Davis left in his car. Davis returned about 11:15, picked him up, and asked if he wanted to go back; the defendant responded that he did. The defendant knocked on the back door. When the victim, a 72-year-old woman, came to answer the door, Davis entered through a front window, grabbed the victim, and opened the back door and let the defendant in. The defendant looked around the house. He then followed Davis into the woods behind the victim's house where he found Davis "having sex" with the victim. She was pleading with Davis, asking him not to hurt her. Davis and the defendant carried the victim back into her home and laid her on a bed. The defendant then "had sex" with her. While this was going on, Davis was looking through the house for money, but found only jewelry. Unable to find any money, Davis threw the victim on the floor and, according to the defendant, Davis started stomping on her, asking "Where's the money, where's the money?" The defendant testified he pulled Davis off the victim and they left the house. On the way out, the defendant picked up a butcher knife but he fell and dropped it before he got to his car. Davis took some jewelry, which he kept himself. The defendant also stated that he was 26 and weighed about 170 at the time of the crime, and Davis was 18 and weighed 120 or 130.

The doctor who performed the autopsy on the victim testified that she was 5 feet, 3 1/2 inches tall and weighed approximately 90 pounds. She had sustained a blow to the back of her head, her sternum was broken in two, several of her ribs were broken, there were several lacerations in the wall of her vagina and a tear in the vagina which penetrated the abdomen, and she had been strangled. The doctor testified that she was alive when she received all of these injuries, including the strangulation which resulted in her death. When the victim's body was discovered about 1 p.m. the next day (January 6), it was lying on the kitchen floor.

The state also showed that blood on one of the defendant's shoes and on his shirt was of the same type as the victim's, that a pubic hair found in the defendant's undershorts (state's exhibit 27) was microscopically identical to a sample of the victim's hair (state's exhibit 30), and that a diamond ring which had belonged to the victim was found under the seat in the defendant's car.

1. The defendant's first enumeration of error is that the evidence is insufficient to support the verdict as to the murder and

the robbery. We disagree. The evidence is sufficient to allow a rational trier of fact to find the defendant guilty of murder and robbery, as well as rape, beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Defendant's second enumeration of error is that the trial court erred in excluding three jurors, Mr. Clifford McIntosh, Mrs. Mae Sue Moon, and Mrs. Casey D. Freeman, as being conscientiously opposed to capital punishment. Having examined the transcript of the voir dire, we have concluded that Mr. McIntosh was properly excused because he stated "unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal...." Witherspoon v. Illinois, 391 U. S. 510, 516 n. 9 (88 SC 1770, 20 LE2d 776) (1968); *Blankenship v. State,* 247 Ga. 590, 593 (277 SE2d 505) (1981).

As for Mrs. Moon, we find she was properly excused also. The U. S. Supreme Court explained in Witherspoon v. Illinois, supra, 391 U. S. at 522 n. 21: "[N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" Thus Witherspoon does not prohibit disqualification of two categories of jurors: (1) those who make it unmistakably clear that they would automatically vote against the death penalty without regard to the evidence in the case before them, and (2) those who make it unmistakably clear that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Most decisions involve jurors possibly falling into the first category; Mrs. Moon is within the second category. Having first stated that she was conscientiously opposed to capital punishment, Mrs. Moon was asked: "Will your reservation about capital punishment prevent you from making an impartial decision on the issue of this defendant's guilt?" She responded: "No doubt." And when queried, "You say yes?", she responded, "Yes." Thus the trial court did not err in excluding her for cause.[3]

---

[3] It appears that this response disqualifies a juror even under our bifurcated procedure since the U. S. Supreme Court has described Witherspoon as involving a "state procedure for selecting juries in capital cases, where the jury did the sentencing and had complete discretion as to whether the death penalty should be imposed." Adams v. Texas, 448 U. S. 38, 43 (100 SC 2521, 65 LE2d 581) (1980).

The voir dire examination of Mrs. Freeman was as follows:

"The Court: Mrs. Freeman . . . are you conscientiously opposed to capital punishment?

"Juror: Yeah, I think I am. I tell you the way I feel about it. I could kill somebody in self-defense; but to just kill somebody, I don't believe I could.

"...

"The Court: All right. And is there . . . any set of circumstances or facts or evidence where you could impose capital punishment on trial of a case? That is the death penalty?

"Juror: No, I don't think so.

"The Court: Could you consider fairly and fully the death penalty as one of the penalties provided by the laws of Georgia as punishment for those found guilty of certain offenses and then to vote to impose it should the facts and circumstances of a case so warrant it?

"Juror: No, I don't think so." Defense counsel asked a question, to which the state objected. The court allowed defense counsel to rephrase the question, whereupon the juror responded:

"Juror: Well, I might consider death in some circumstances, but I don't know.

"The Court: But you're not certain of that?

"Juror: No, I'm not certain of that. This is the first time I've ever been confronted with this murder business."

The juror was then excused for cause. In Maxwell v. Bishop, 398 U. S. 262 (90 SC 1578, 26 LE2d 221) (1970), the Supreme Court found a juror not disqualified under Witherspoon where the prospective juror was asked " . . . do you have any conscientious scruples about capital punishment that might prevent you from returning such a verdict" and the juror answered: "I think I do."

As the above quotations from Witherspoon show, in order to be disqualified a prospective juror (in the first category) must make it "unmistakably clear" that he or she would automatically vote against the death penalty in any and all cases. Unless a venireman states "unambiguously" that he or she would automatically vote against imposition of capital punishment no matter what the trial might reveal, the juror is not disqualified. Witherspoon v. Illinois, supra, 391 U. S. at 516 n. 9, 522 n. 21. Ambiguous or equivocal answers are not sufficient for disqualification for cause. *Blankenship v. State,* supra, 247 Ga. at 593; see also *Cofield v. State,* 247 Ga. 98, 101 n. 4 (274 SE2d 530) (1981). This record does not support the requisite finding that Mrs. Freeman made it "unmistakably clear" that she "would automatically vote against" the death penalty. Thus the trial court erred in excluding her for cause.

Since one juror was erroneously struck for cause on the basis of opposition to capital punishment, even though the state had one peremptory strike remaining when the 12th juror was seated, the defendant's death sentence must be vacated, and the case remanded for imposition of a life sentence or resentencing in accordance with the law. *Blankenship v. State,* supra, 247 Ga. at 596.

3. In his third enumeration of error, the defendant complains that the trial court erred in admitting two exhibits (state's exhibits 8 and 14) over his objection that they had not been properly qualified as business records. Exhibit 8 was a copy of a gas bill. Mr. James Bryant testified that he drove a propane gas truck for Texgas, that on the morning of January 6, 1981, he delivered gas to the victim's home at about 9 a.m., and that he went to the door to leave the bill. When he knocked on the door it swung open; however, when he didn't hear a response to his knock he caught the door and closed it on the ticket so that it would not blow away. (State's exhibit 7 was a photograph showing the gas bill lying on the door sill.) Bryant identified exhibit 8 as the bill he left at the victim's house and the state moved its introduction. When the defendant objected that it was not properly authenticated as a business record, the state responded that it was not being introduced as a business record, but as a piece of evidence found at the scene. The trial court admitted it on that basis. We affirm. The purpose of Code Ann. § 38-711, the so-called Business Records Act (Ga. L. 1952, p. 177), is to provide for the admissibility of records that would otherwise be excluded as hearsay. *Hall v. State,* 244 Ga. 86, 92 (259 SE2d 41) (1979). The exception allows the content of the document to be proven. Here the content of the gas ticket is irrelevant; the state introduced it not to prove the amount of the gas bill but in support of the witness' testimony that it had been left at the victim's home at a certain time, and that at that time the front door was unlocked and the victim did not respond to knocking. We find no error in the admission of exhibit 8.

The defendant also complains that the radio log of the Elbert County Sheriff's Department for January 6, 1981 (state's exhibit 14), was admitted over his objection that it was not properly authenticated as a business record. We do not agree. The woman who served as radio dispatcher and secretary to the sheriff's office, and who kept the radio log on January 6, 1981, testified that among her duties was to keep the radio log; that she had kept it on January 6, 1981; that state's exhibit 14 was a page from the radio log she kept on January 6; that it was accurate and correct and no alterations or corrections had been made; that it was kept in the regular course of business; and that she contacted two deputies at 1:11 p.m. and told them to go to the Rucker address "10-18" (immediately). We find no

error in the admission of state's exhibit 14 which had been identified by its author. *Chafin v. State,* 246 Ga. 709, 716 (273 SE2d 147) (1980).

4. Defendant's fourth enumeration of error is that the trial court erred in allowing into evidence state's exhibit 29, a pillbox containing samples of head hair, pubic hair and nails taken from the defendant, over his objection that the chain of custody had not been established. The state put forth testimony from Dr. Charles Saeed that he personally took the samples from the defendant and packaged them, and that he passed the exhibit on to Deputy Charles Perlotte. Deputy Perlotte testified that he received it from Dr. Saeed and gave it to Deputy Charles Dickerson. Deputy Dickerson testified that he received it from Deputy Perlotte and gave it to Agent Jenkins of the GBI. Agent Jenkins testified that she received it from Deputy Dickerson and took it to the State Crime Laboratory where she turned it over to Linda Tillman. Linda Tillman, a forensic serologist at the State Crime Laboratory, testified but did not mention exhibit 29. (A forensic serologist examines body fluids and dried stains of body fluids.) Francis Jarvis, a criminologist at the State Crime Laboratory who specializes in the area of fiber analysis, testified that he received exhibit 29 from GBI Agent Jenkins and returned it to her at trial.

The trial court was authorized to find that the chain of custody of exhibit 29 was established and the court did not err in admitting the exhibit. See *Painter v. State,* 237 Ga. 30, 33 (226 SE2d 578) (1976).

5. The defendant's remaining two enumerations of error relate to cumulative testimony admitted during the sentencing phase of the trial and need not be reached here in view of our holding in Division 2. We note however that the sentencing charge to the jury was not as specific regarding mitigating circumstances as required. *Hawes v. State,* 240 Ga. 327 (9) (240 SE2d 833) (1977); see also Spivey v. Zant, —— F2d —— (former 5th Cir., No. 80-7243, decided Nov. 16, 1981).

*Convictions affirmed; death sentence vacated and case remanded. All the Justices concur, except Gregory, J., who concurs in the judgment only, Jordan, C. J., who dissents to Division 2 and to the reversal of the death penalty, Marshall, J., who dissents to Division 2, and Weltner, J., not participating.*

DECIDED JANUARY 5, 1982.

*Thomas M. Strickland,* for appellant.

*J. Cleve Miller, District Attorney, Lindsay A. Tise, Jr., Assistant District Attorney, Michael J. Bowers, Attorney General, George M.*

*Weaver, Staff Assistant Attorney General,* for appellee.