## S00A1229. GLASER v. THE STATE.
### (535 SE2d 231)

THOMPSON, Justice.

Defendant Dorothy Glaser was convicted of attempt to commit murder, and malice murder, in connection with an ongoing scheme in which her husband, Jerome Glaser, was ultimately shot and killed.[1] Initially, defendant hired someone to shoot the victim, but the shooting was bungled and he survived. Almost four weeks later, defendant herself shot and killed the victim, making it look like an accident. It took more than five years for the truth to come out — when defendant was caught conspiring with her sister in a "family plot" to murder yet another family member.

1. On October 4, 1985, defendant and the victim returned to their home after a football game. As the victim went to the bedroom to get a pillow, an "intruder" fired shots from inside the back of the home. The victim was struck by a bullet, but he was not injured severely. The police found no signs of a forced entry into the home. The "intruder" was never found, and the gun was never recovered.

Following the shooting, defendant told Houston County Sheriff's Department Investigator Hank Lowry that her husband had been acting strange, and that she was concerned. According to defendant, her husband had become depressed and paranoid: He thought someone was out to kill him; he was afraid to go out of the house; he refused to sleep in his bedroom; and he purchased a gun that he would not let out of his sight. Lowry suggested that defendant's husband should seek the help of a mental health professional, and he agreed.

On the morning of October 31, 1985, defendant took her children to school and then returned home and found the victim asleep. According to defendant, she went to the bedroom to talk to her husband, who jumped up, aimed a gun at her, and yelled "Who are you

---

[1] Defendant was indicted on April 5, 1993, and charged with malice murder and criminal attempt to commit murder. Trial commenced on August 16, 1993, and the jury returned its verdict on August 20, 1993, finding defendant guilty on both counts. The trial court sentenced defendant to life imprisonment for murder and ten years to serve consecutively for attempted murder. Defendant's timely filed motion for a new trial was denied on March 15, 1999, and defendant filed her notice of appeal the same day. The appeal was docketed in this Court on April 7, 2000, and orally argued on June 19, 2000.

and what are you going to do?" Continuing her story, defendant said that she grabbed the gun and wrestled with her husband to take it away from him; and that the gun went off and killed him.

An autopsy was performed and, based on the angle of the bullet and the lack of gunpowder stippling on the victim's body, the death was ruled a homicide. However, defendant requested that a coroner's inquest be held, and on December 30, 1985, the coroner's jury ruled that the victim's death was accidental. Accordingly, no charges were brought against defendant at that time.

Defendant subsequently collected over $250,000 on her husband's double indemnity life insurance policy. She also filed a malpractice lawsuit against the psychologist who treated her husband, and, after an appeal to this Court,[2] received a $40,000 settlement.

Five years later in July 1990, defendant conspired with her sister, Nell Matkin, to hire a hit man to kill Nell's husband, Andy Matkin. Defendant contacted her nephew, Bobby Spargo, to enlist his help in the scheme; however, Spargo notified the G.B.I. of the plot.[3]

The G.B.I. placed a microphone and recorder on Spargo to listen to and record conversations between Spargo and defendant. In the recorded conversations which followed, defendant made several statements implicating herself in both the murder and the attempted murder of her husband. Defendant stated that she had hired someone to kill her husband on October 4, adding that "[T]he little son-of-a-bitch didn't do the job right"; and she described how she planned the October 31 murder of her husband to make it appear accidental:

> "He was acting delirious and going crazy and all this shit and paranoid. I had set that scene, too, for a whole month. That happened on October the 4th, that first shooting. Okay, he didn't die until October 31st, so I had a whole month to prepare the police and neighbors and friends about his delirium, his paranoia, his schizophrenia, his idea that somebody was coming back to get him."

Finally, defendant admitted that she "shot [the victim] with his own gun."

The evidence was sufficient to enable any rational trier of fact to find defendant guilty beyond a reasonable doubt of malice murder and attempt to commit murder. *Jackson v. Virginia,* 443 U. S. 307 (99

---

[2] See *Glaser v. Meck,* 258 Ga. 468 (369 SE2d 912) (1988).

[3] Defendant was charged with conspiracy to commit murder for her role in the plot to kill Matkin. Defendant pled guilty and was sentenced to ten years in prison, four years to serve and the balance on probation.

SC 2781, 61 LE2d 560) (1979).

2. Defendant asserts the trial court erred in permitting the State to introduce evidence of defendant's 1990 conspiracy conviction, arguing it was not offered for a proper purpose, and was not sufficiently similar to the charges in the case at hand. We disagree.

The evidence was properly admitted for the purpose of showing defendant's bent of mind, course of conduct, motive, and intent, or lack of mistake. *Maggard v. State*, 259 Ga. 291, 293 (380 SE2d 259) (1989); *Barnes v. State*, 245 Ga. 609, 610 (2) (266 SE2d 212) (1980). And the other transaction evidence was sufficiently similar to the evidence in this case so as to render it relevant and admissible.

The connections between the other transaction and this case are at least fourfold: (1) in each case, the victim was a close relative, but not a blood relative, of defendant; (2) in each case, defendant hired a hit man to kill the victim; (3) a handgun was used in this case, and a handgun was to be used in the other transaction; (4) money was involved as a motive in each case. Given these connections, it cannot be said that the trial court erred in admitting the evidence of defendant's conspiracy conviction. *Mullins v. State*, 269 Ga. 157, 158 (2) (496 SE2d 252) (1998). "[T]he independent act does not have to be identical in character to the charged offense if there is a sufficient connection between them." *Smith v. State*, 264 Ga. 46, 47 (2) (440 SE2d 188) (1994).

3. Defendant contends the taped conversations between defendant and Bobby Spargo should have been deemed inadmissible because the State failed to comply with *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). In this regard, defendant asserts she did not receive the tapes until Spargo testified on the third day of the trial, and she did not have adequate time to review the tapes (which are four to five hours long) and prepare to cross-examine Spargo. This contention is without merit because the taped conversations consisted of defendant's own statements. " 'A (*Brady*) motion . . . does not reach the defendant's own statements made prior to trial for they are already known to the defendant. (Cit.)' " *McCoy v. State*, 174 Ga. App. 621, 624 (330 SE2d 746) (1985), citing *Williams v. State*, 164 Ga. App. 148, 149 (296 SE2d 739) (1982). Besides, defendant failed to show that any exculpatory information was contained within the tapes, and "evidence is not discoverable pursuant to a *Brady* motion if it is not exculpatory." *McCoy*, supra.

Defendant also asserts that the entire length of the tapes and transcripts should have been admitted into evidence pursuant to OCGA §§ 24-2-4 and 24-3-38. However, the trial court specifically asked defendant's counsel if he wished to have the entire statement admitted, and he replied that he did not.

4. The trial court did not err in allowing the jury to rehear

excerpts of taped conversations between defendant and Bobby Spargo, even though the jury had already begun deliberating. "[W]hether to permit the replaying of a portion of testimony is within the discretion of the trial court, and the court is not required to give a cautionary instruction. [Cits.]" *Stephens v. State*, 261 Ga. 467, 468 (4) (405 SE2d 483) (1991).

5. After she was sworn, but before opening statements, juror Alana McIntosh notified the judge that, upon reflection, she realized that she knew defendant's son and that she saw him regularly. Although she said that she "would try her very best" to be impartial, she added that she could not be positive that she would be able to do so, or that she would be able to set aside her relationship with defendant's son and base her decision solely on the evidence presented in court. Under these circumstances, and inasmuch as defendant does not assert that the alternate juror was unqualified, we find no error in the dismissal of juror McIntosh for cause. *Reynolds v. State*, 271 Ga. 174, 175 (2) (517 SE2d 51) (1999).

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., who concurs in judgment only as to Division 2.*

DECIDED SEPTEMBER 11, 2000.

*Jeffrey L. Grube*, for appellant.

*Kelly R. Burke, District Attorney, Amy E. Lambert, Assistant District Attorney, Thurbert E. Baker, Attorney General, Daniel G. Ashburn, Assistant Attorney General*, for appellee.