S08A1921. MANLEY v. THE STATE.

(672 SE2d 654)

MELTON, Justice.

Charles Travis Manley appeals his conviction for the malice murder of Vieng Phoxivay, contending, among other things, that the trial court erred in denying his motion for a mistrial after the State failed to properly disclose the location from which a certain knife had originally been seized after the crime was committed.[1] For the reasons set forth below, we affirm.

Viewed in the light most favorable to the verdict, the record shows that, on October 10, 1987, Phoxivay drove to the home of her boyfriend, James Kenneth Baker, Jr., for a brief visit before going to work. Later, while driving to work, Phoxivay had a flat tire, and Manley, who lived and worked nearby, stopped and offered to give Phoxivay a ride back to Baker's house. Manley was driving a green 1975 Chevrolet El Camino with a white roof. After dropping off Phoxivay, Manley departed from the Baker residence only to return later with a spare tire to fix Phoxivay's vehicle. Phoxivay then left

---

[1] On September 12, 2005, Manley was indicted in Harris County for one count of malice murder and one count of felony murder, the latter of which was quashed prior to trial. Following a jury trial commencing on September 5, 2007, Manley was found guilty of malice murder, and, on September 17, 2007, the trial court sentenced Manley to life imprisonment. Thereafter, Manley filed a motion for new trial on September 20, 2007, and the motion was denied on April 21, 2008. Manley timely filed his notice of appeal on May 2, 2008, and his case was docketed in this Court on July 29, 2008, and was orally argued.

with Manley and disappeared. Several witnesses saw Phoxivay leave with Manley in his car. Phoxivay's vehicle was found abandoned, and a number of items were retrieved from its trunk, including a hunting knife with unidentified fibers on its blade.

Approximately two years later, Phoxivay's skeletal remains were found in a remote wooded area near back roads with which Manley was familiar. Authorities also discovered a white blouse, material from a knitted sweater, strips of clothing tied in knots, and a pant leg that had been cut from the rest of the garment. From this evidence, GBI agents deduced that Phoxivay had been tied to a tree with strips of her own clothing, sexually assaulted, and then murdered.

On November 13, 1989, GBI Agent Gary Rothwell interviewed Lucretia Darlene Boynton, a neighbor of Phoxivay's boyfriend, Baker, regarding the events of October 10, 1987. Boynton recounted seeing an El Camino matching the one owned by Manley, and she described the driver as a heavy set white male in his thirties or forties, with a full beard and mustache and wearing glasses. This description matched Manley's appearance at the time. However, Boynton was not able to identify Manley from a photographic line-up. On September 5, 1991, Agent Bothwell also showed Baker a photographic line-up which included Manley's picture from September 1, 1990. Baker did not positively identify anyone at that time.

Between July 1992 and early 2005, the investigation slowed. On April 8, 2005, Investigator Clay Bryant, who was handling the case at the time, interviewed Baker again. Baker identified Manley's vehicle as the one he had seen on October 10, 1987 and identified Manley's picture from the same photographic line-up he had been shown in 1991. A few days later, on April 11, 2005, Investigator Bryant interviewed Boynton once more. Like Baker, Boynton identified both Manley and his vehicle out of the photographic line-up. Furthermore, Boynton informed investigators that she had seen Phoxivay leave the trailer park in Manley's vehicle on October 10, 1987.

One week later, Investigator Bryant interviewed Johnny Wentz. Wentz lived next door to Baker in the Moreland Trailer Park on October 10, 1987. Wentz confirmed that Manley's vehicle was the one he had seen in front of Baker's home on October 10, 1987 and stated that Manley was driving the vehicle on that day.

Additional evidence showed that, shortly after the murder, Manley repainted his El Camino, and, shortly after Phoxivay's remains were discovered, he sold the car to a man in Alabama. Furthermore, similar transaction evidence was introduced which showed that, prior to the murder of Phoxivay: (1) Manley raped a 15-year-old girl at knife-point; (2) Manley tried to force his ex-wife to have sexual relations at gun-point; and (3) Manley attacked a

teenaged girl at gun-point after forcing her boyfriend to crawl into the trunk of the car they were parked in.

This evidence was sufficient to enable the jury to find Manley guilty of the murder of Phoxivay beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

1. Citing *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963) and its progeny, Manley contends that the trial court erred by denying his motion for a mistrial after the State allegedly violated discovery rules by introducing evidence that a knife found after the murder had been located in the trunk of Phoxivay's car, not at Baker's home.

The record shows that, following Phoxivay's disappearance, police recovered a knife with fibers on it from the trunk of Phoxivay's abandoned car. A property receipt for the knife was placed in Phoxivay's original missing persons file that was created in 1987. In November 1989, after Phoxivay's remains had been discovered, Agent Rothwell created a new death investigation file to hold evidence regarding the newly-established murder case. In this process, Agent Rothwell pulled certain police records, including Phoxivay's original missing persons file, copied these records, and attached the copies to his own separate file regarding the ongoing murder investigation. For some unknown reason, a copy of the property receipt for the knife did not make its way into Agent Rothwell's death investigation file, and the original missing persons file was eventually sent to storage. In 2005, after the investigation was reopened, Agent Rothwell reviewed his death investigation file, and he created a synopsis of the file to assist Investigator Bryant, who was taking over the case. In this synopsis, Agent Rothwell noted that the origin of the knife, as well as a number of other items seized, was uncertain and stated that the items could have come from either Baker's home or Phoxivay's vehicle.[2] As part of trial discovery, Manley received this death investigation file which included Agent Rothwell's synopsis but excluded the original property receipt.

During opening statement, Manley argued, among other things, that Phoxivay's murder was committed by Baker. To support this contention, Manley stated that the evidence would show that: Baker and Phoxivay had a violent domestic relationship; Phoxivay was pregnant with Baker's child and Baker wanted her to terminate the pregnancy; Baker threatened to kill Phoxivay three days before her

---

[2] The synopsis indicates that the following pieces of evidence were gathered in 1987: one windbreaker jacket; one handwritten note; one hunting knife; and one sheet of paper. The synopsis then states: "These items submitted to DOFS under case # 87-22515. Their whereabouts are unknown. Their origins are unclear. Some items are from the victim's car and others may have been taken from Ken Baker or his residence."

disappearance; Baker never attempted to contact or find Phoxivay following her disappearance; Baker chose not to attend Phoxivay's memorial service; Baker was a self-proclaimed "hellion" with whom Phoxivay was afraid to be alone; Baker was originally a suspect in the murder and had no alibi; and friends and family members had speculated that Baker may have been responsible for the murder. In addition, Manley argued that the knife in question had been taken from Baker's home, had been lost by the State, and had fibers on it which would have shown that it was used to cut Phoxivay's clothing prior to her murder. Later, during trial, Manley elicited testimony to support his contentions, including an admission by Baker that police had searched his house and found the knife there.

On the night following opening statements, however, Agent Rothwell reviewed the original missing persons file which he had just received from archives, and he discovered the receipt for the knife, stating that the knife and other items had been discovered in the trunk of the victim's car, not Baker's home. The following day, the State introduced the receipt into evidence during Agent Rothwell's testimony, and, in addition, both the State and Manley elicited testimony from Agent Rothwell indicating that, at the time that Manley made his opening argument, the property receipt had not been made available to Manley. Manley contemporaneously objected to the introduction of the property receipt and moved for a mistrial, contending that the credibility of Manley's defense, namely that Baker had committed the murder, was wholly destroyed. The trial court overruled the objection and denied the motion for mistrial.

Later, in closing, Manley argued at numerous points that the origin of the knife remained in question. Manley reminded the jury that Baker had admitted on the stand that the knife had been found at his home. Manley also contended that the State's late discovery of the property receipt was suspicious and that it was unlikely that a 19-year-old pregnant woman like Phoxivay would be driving around with a hunting knife in the trunk of her car. In addition, Manley continued to argue that Baker was the murderer based on all the contentions that had originally been raised in his opening statement.

In general, evidence which is not exculpatory is not subject to discovery under *Brady*. See *Glaser v. State*, 272 Ga. 757 (3) (535 SE2d 231) (2000). In his brief, Manley makes no contention that the discovery of the knife in question was exculpatory. In addition, the record belies Manley's contention that his entire defense was destroyed after discovery of the property receipt in question. Even without the knife, Manley forcefully argued that Baker, who had a volatile relationship with Phoxivay and had threatened to kill her, was the actual murderer. Moreover, even with the property receipt, Manley was able to draw its accuracy into question based on Baker's

testimony that the knife had been found in his home, and the jury's difficulty in reaching a verdict shows both that the credibility of Manley's defense counsel remained intact and that his arguments were well-received. Therefore, for all of these reasons, we cannot say that the trial court erred by denying Manley's motion for a new trial.[3]

2. Manley contends that the trial court erred by: (a) allowing a witness for the State to invade the province of the jury and (b) allowing the State to improperly bolster the credibility of its witnesses during closing arguments.

(a) During direct examination, the State asked Agent Rothwell: "After the autopsy, after reviewing the GBI file, what did you do in your investigation?" Agent Rothwell responded: "It became evident to me that I needed to go back and re-interview some of the witnesses because it was apparent that [Manley] was responsible for the murder of [Phoxivay]." Following this answer, Manley moved for a mistrial, contending that Agent Rothwell's testimony improperly invaded the province of the jury by giving his opinion on the ultimate issue of fact, namely Manley's guilt. The trial court denied the motion and instructed the jury to disregard Agent Rothwell's response.

> While we recognize that reversible error may have occurred had the trial court admitted the testimony over [Manley]'s objection, that is not what happened here: instead of admitting the testimony, the trial court took measures to exclude it by directing the jury not to consider it. . . . [T]he exclusion of the testimony and the trial court's curative instructions prevented the error from occurring.

*Brown v. State*, 262 Ga. 833, 834 (1) (426 SE2d 559) (1993).

(b) Manley argues that the State, during closing argument, improperly bolstered the testimony of its witnesses by stating that the investigators, officers, and the prosecuting attorney involved in the murder investigation would not sacrifice their careers in law enforcement to frame Manley. The record shows that, prior to the State's argument, the defense had raised this implication numerous times in closing argument. The defense argued that the State's witnesses had an inappropriate and unjustified "agenda" to convict his client, purposefully "poisoned" witnesses, conveniently lost

---

[3] Manley raises a secondary contention that the property receipt was inadmissible hearsay; however, the trial court properly ruled that it was admissible under the business records exception. See, e.g., *Allen v. State*, 248 Ga. 676 (3) (286 SE2d 3) (1982); OCGA § 24-3-14.

important evidence, and purposefully and wrongfully manipulated other evidence to fit the theory of the prosecution. The State was entitled to respond to these direct accusations of wrongdoing. In rebutting Manley's contentions, "the State's comments did not constitute an opinion about [the] veracity [of these witnesses]. The comments merely urged the jury to make a deduction about veracity from the facts." (Citations omitted.) *Moody v. State*, 273 Ga. 24, 27 (4) (537 SE2d 666) (2000). This deduction was that, contrary to Manley's claims, the investigators, officers, and the prosecuting attorney involved in his case, all of whom had longstanding careers with the State, had no motivation to jeopardize those careers by acting on improper agendas to frame Manley through the manipulation of evidence and poisoning of witnesses. As such, there was no error.[4]

3. Manley contends that the trial court erred by denying his request to call an expert witness to testify regarding the reliability of eyewitness identifications.

> [T]he admission of expert testimony regarding eyewitness identification is in the discretion of the trial court. Where eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial courts may not exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification. However, the admission or exclusion of this evidence lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion.

(Citations, punctuation and footnote omitted.) *Johnson v. State*, 272 Ga. 254, 257 (1) (526 SE2d 549) (2000). This is not a case in which the State lacked substantial corroboration of eyewitness testimony by any other evidence. Here, the State offered evidence and testimony showing that: (1) in 1989, Boynton identified the assailant's car as an El Camino even though she was unable to identify Manley from a photographic line-up; (2) Manley, in fact, owned an automo-

---

[4] The only fact not in evidence mentioned by the prosecutor was that he had been practicing law for 25 years. Contrary to the dissent, this statement of this fact in closing arguments was not harmful. Moreover, even in its absence, the jury could deduce that the prosecutor, who had no relationship with Manley, had no motivation to frame him irrespective of the amount of time he had been practicing law.

bile matching the description of the one that the victim had been seen in before the murder; (3) three separate witnesses identified Manley's car as the one they had seen before the murder with no equivocation; (4) shortly after the murder, Manley chose to repaint his vehicle in a manner that actually reduced its value; (5) shortly after the victim's body was found, Manley sold his car to a man in Alabama; (6) Manley was involved in three similar transactions, all involving sexual attacks at knife-point or gun-point and two of which were aimed at young women like the victim in this case; (7) Manley lived and worked nearby the victim's residence; and (8) Manley was familiar with the back roads leading to the remote wooded area where the victim's body was discovered.

Given the nature of the corroborating evidence offered by the State, it cannot be said that the trial court abused its discretion in deciding, in light of this evidence, expert witness testimony was not needed in this matter. *Johnson v. State*, 272 Ga. at 257 (2).[5]

4. Manley contends that the trial court erred by coercing the jury into reaching a verdict after denying his motion for a mistrial due to a deadlocked jury. "[W]hether a jury is hopelessly deadlocked is an evaluation we commit to the sound discretion of the trial court, subject to appellate review for an abuse of discretion." *Romine v. State*, 256 Ga. 521, 525 (1) (b) (350 SE2d 446) (1986).

In this case, the record shows that, over the course of several days, the jury sent four notes to the trial court indicating that they were not able to reach a unanimous verdict. Following the third note, the trial court gave the jury an *Allen* charge,[6] over Manley's objection. Following the *Allen* charge, the jury again indicated that it could not reach a verdict. At that point, the trial court called the jury into the courtroom, and the foreman told the trial court that the split was presently 8-4 and that there had been movement on the vote that day. The trial court then sent the jury back for more deliberations, stating that "both sides would like to have a verdict if we could."

Citing *Jenkins v. United States*, 380 U. S. 445 (85 SC 1059, 13 LE2d 957) (1965), Manley argues that this statement by the trial court coerced the jury into reaching a verdict. As an initial matter, although Manley had previously made a motion for a mistrial at the time the *Allen* charge was given, he made no objection to the state-

---

[5] The dissent isolates a footnote out of its context from this case in support of its proposition. *Johnson*, however, stresses that these decisions are within the sound discretion of the trial court. In that case, after considering corroborating evidence including similar transaction evidence and the testimony of multiple eyewitnesses, we determined that, although expert testimony may have been helpful to some degree, the trial court had not abused its discretion in refusing to admit this testimony. That outcome supports the affirmance of the trial court's decision in this case.

[6] See *Allen v. United States*, 164 U. S. 492 (17 SC 154, 41 LE 528) (1896).

ment by the trial court about which he now complains. In the absence of such a contemporaneous objection, Manley has waived the right to argue that the statement was improper on appeal. Moreover, even if Manley's argument were preserved, it cannot be said that the trial court's statement was improperly coercive. In *Jenkins*, upon which Manley relies, the trial court improperly instructed the jury: "You have got to reach a verdict in this case." Here, in contrast, the trial court merely informed the jury that "both sides would like to have a verdict" if possible. While the statement by the trial court in *Jenkins* was coercive because it indicated to the jury that they had no choice but to reach a verdict, the statement by the trial court in this case cannot be considered coercive because it did not imply in any way that a verdict was required. Moreover, the trial court's non-coercive statement immediately followed a proper *Allen* charge and an explanation from the trial court to the jury that it in no way wished to force a verdict. Therefore, the jurors had been made aware that they were not required to forego their established opinions in favor of a verdict. *McKee v. State*, 277 Ga. 577 (5) (591 SE2d 814) (2004).

*Judgment affirmed. All the Justices concur, except Hunstein, P. J., who dissents.*

HUNSTEIN, Presiding Justice, dissenting.

I must respectfully dissent to Divisions 2 (b) and 3 of the majority opinion.

1. In Division 2 (b), the majority finds no error in certain comments made by the prosecutor during closing argument. After characterizing the defense's argument as a claim that the evidence against Manley was "all lies" and the result of a conspiracy, the prosecutor argued:

> Clay Bryant, over, what, 30 years in law enforcement. He's willing to throw it all away ... Georgia state trooper, Hogansville police chief, DA investigator, public defender investigator, he's willing to throw it all away to frame Charles Travis Manley. Gary Rothwell, 26 years with the GBI, willing to throw it all away to frame Charles Travis Manley. Me, 25 years in the practice of law, willing to ... throw it all away to frame Charles Travis Manley.

The majority correctly notes that it is not improper for counsel to urge the jury to make a deduction regarding the veracity of a witness from proven facts. See *Shirley v. State*, 245 Ga. 616 (1) (266 SE2d 218) (1980). Here, however, the facts in evidence as to the work

histories of Bryant and Rothwell[7] could not form the basis of such a deduction, as an impressive resume does not necessarily bear any relation to a propensity for truthfulness. See Webster's Third New International Dictionary (Unabridged, 1967), p. 589 (defining "deduce" as "to draw (a conclusion) necessarily from given premises"). The prosecutor's argument urged the jury to find these witnesses to be truthful based on unrelated facts, as well as facts not in evidence, constituting a personal opinion as to the witnesses' veracity and thus improper bolstering. Given the critical nature of these witnesses' testimony to the State's case, I cannot conclude that it is highly probable that the bolstering of their credibility did not contribute to the verdict. See *Bolden v. State*, 272 Ga. 1 (525 SE2d 690) (2000). Accordingly, reversal is required on this basis.

2. In Division 3, the majority holds that the trial court properly exercised its discretion in denying Manley's request to call an expert witness on eyewitness identification. This 1987 case was "cold" in 2005 when investigator Bryant was assigned to it, as the evidence gathered to that point had apparently been deemed insufficient for an arrest or indictment. Baker was unable to make an identification from the photo lineup he was shown in 1991, yet chose Manley's picture from the same lineup in 2005; Boynton was unable to make an identification from the photo array she was shown in 1989, yet chose Manley's picture from a lineup using the same photos in 2005. Although Wentz had not seen a photo lineup prior to 2005, he identified without hesitation a man he had at most encountered briefly more than 17 years earlier.

The majority states that Manley sought to introduce expert testimony regarding eyewitness identification "simply [to show] that the identifications occurred so many years after the crime had been committed that they should be considered suspect," a matter that it considers to be within the ken of the average juror. Pretermitting whether the majority's characterization of that particular issue as "plain and easily understood" is correct, the proffered testimony of the expert indicated that he would have testified not only as to the effect of the passage of time on the accuracy of an identification, but also regarding the effect of various photo lineup procedures on identification accuracy and the only "modest" association between the confidence of a witness in making an identification and its accuracy. See *Johnson v. State*, 272 Ga. 254, 256, n. 2 (526 SE2d 549) (2000) (appropriate to admit expert testimony involving counterintuitive issue such as absence of expected correlation between wit-

---

[7] I note that no facts were in evidence as to the length of time the prosecutor had been practicing law.

ness's expression of confidence and actual accuracy). This testimony would have provided significant assistance to the jury in assessing the reliability of the identifications, and the trial court abused its discretion in excluding it. Because the identifications were a crucial component of the State's case, it follows that the exclusion of the expert testimony was so prejudicial as to require reversal.

DECIDED JANUARY 26, 2009.

*Brian Steel*, for appellant.

*Peter J. Skandalakis, District Attorney, Raymond C. Mayer, Assistant District Attorney, Thurbert E. Baker, Attorney General, Christopher R. Johnson, Assistant Attorney General*, for appellee.