A09A0878. HARPER v. THE STATE.
A09A1091. WILLIAMS v. THE STATE.
A09A1833. REED v. THE STATE.
(686 SE2d 375)

PHIPPS, Judge.

In connection with an armed robbery at a jewelry store, Chad Neal Harper, Kelvin Williams, and Deon Reed, along with two others, were co-indicted, tried together, and convicted of numerous crimes. The appeals of Harper, Williams, and Reed are consolidated herein; the other two cases are not at issue.[1] For reasons set forth below, we affirm the judgments entered in Harper's and Reed's cases and affirm in part and reverse in part the judgment in Williams's case.

At the jury trial, the state showed that at about 3:00 p.m. on

---

[1] The other individuals are Erin Jordan and Andre Traylor. For Jordan's appeal, see *Jordan v. State*, 281 Ga. App. 419 (636 SE2d 151) (2006) (affirming judgment of conviction).

March 31, 2003, four black men wearing gloves and masks or bandanas over their faces burst into a jewelry store. They had hammers and a gun. One of the men pointed the gun at the store manager. The men threatened to kill the employees and shoppers, who all complied with their orders to get down on the floor. The men smashed the glass showcases, swiping jewelry pieces from them. One of the men pressed the gun to the head of an employee. Then several of the men pulled that employee off the floor by her neck, arm, and pants and dragged her about 15 feet across the showroom floor to the store's locked safe, kicking her as well. Along the way to the safe, she sustained a torn rotator cuff. That employee complied with their demands to unlock the safe, and the men emptied most of the jewelry out of it.

Within two minutes of having burst into the store, the men darted out, carrying with them a considerable amount of the store's jewelry in dark bags and various other containers. Outside, the gunman realized that they were being watched by a bystander. The gunman pointed the gun at the bystander and ordered him to turn around, and the bystander complied. The four masked men hurried into a gray, 80s-model Buick that was parked curbside, then sped away.

Meanwhile, county sheriff officers had been summoned to the scene. As soon as the store manager had seen masked men rush into the store, he had pressed a panic button, silently alerting law enforcement. In addition, during the robbery, the store's surveillance camera system had been recording the events onto a videotape. And immediately after the robbers sped out of the parking lot, the store manager called 911 and recounted the incident. The manager also relayed a description of the getaway car, including the car's tag number, which had been reported to the manager by an eyewitness outside. Emergency 911 was also called by a man who had been outside the store when he observed the masked men rush inside and then heard their commands to get down. That caller reported that several black men wearing masks had robbed the jewelry store and were leaving in a car he described as a silver four-door 1988 model Buick.

A patrol officer with the county sheriff's office responded to the ensuing dispatch, which had broadcast a description of the getaway car with the reported tag number, along with information that the tag was registered to a gray 1989 Buick. En route to the jewelry store, the patrol officer particularly noted a Toyota Camry going in the opposite direction; the Camry was traveling at a high rate of speed; it did not slow down to cross railroad tracks; and it drove through an intersection without stopping at a stop sign. That intersection was about 3.5 miles from the jewelry store. Although

noting the Camry's traffic violation of disregarding the stop sign, the officer proceeded toward the scene of the armed robbery as dispatched. After driving about 1.3 miles closer to the jewelry store, the patrol officer saw on the side of the road a gray Buick with three of its doors standing open. Upon close examination of this scene, the officer noted that the Buick's engine was running; its tag matched the one reported to 911; jewelry items and jewelry cases were scattered inside and on the ground outside the Buick; and a pair of gloves and a face mask were also on the ground. Recalling the erratic driving maneuvers of the Camry that had sped past him only moments earlier, the officer announced over police radio to be on the lookout (BOLO) for that vehicle, which appeared to be headed for Interstate 85.

Shortly thereafter, nearby officers spotted on that interstate a Camry that matched the description provided in the BOLO, and they initiated a traffic stop. After about a two-minute pursuit, the Camry came to a stop. Inside the Camry were a female driver, to whom the Camry was registered, as well as four black males, including the appellants Harper, Williams, and Reed. Harper immediately fled the Camry on foot; the other four occupants remained inside the vehicle, but were removed by the officers. The officers who approached the vehicle noticed inside, or on the ground just outside the Camry, assorted jewelry pieces, jewelry cases, black bags, a gun, a glove, glass fragments, and various other items. Harper was soon apprehended about 300 to 500 yards from the Camry. By about 3:30 p.m. and within 10.5 miles of the jewelry store, the four men, along with their driver, were taken into custody.

Law enforcement officers processed the traffic stop scene, collecting from the ground jewelry items, a bandana, and a glove. The Camry was searched onsite, impounded, and searched again the next day. Items recovered from inside the car included a gun, bags containing assorted jewelry, and loose jewelry items. The jewelry pieces seized were determined to be the property of the jewelry store where the armed robbery had occurred.

At the joint trial for the five defendants, the state played for the jury the surveillance videotape depicting the armed robbery at the jewelry store. None of the defendants testified; none of them called a witness. Harper, Williams, and Reed were all found guilty of and were sentenced for the same five offenses: (i) aggravated assault, by pointing a pistol at the store manager; (ii) kidnapping with bodily (shoulder) injury, upon the store employee; (iii) armed robbery of that store employee; (iv) aggravated assault, by kicking that store employee about the body with the intent to rob; and (v) aggravated assault, by pointing a pistol at the bystander. Harper, Williams, and Reed challenge their convictions in Case Nos. A09A0878, A09A1091,

and A09A1833,[2] respectively.

## Case No. A09A0878

1. Harper contends that the trial court erred by denying a motion to suppress the evidence found in and about the Camry.[3] Harper maintains on appeal that the traffic stop was supported by neither probable cause nor the requisite articulable suspicion and that therefore the subsequent searches of the vehicle at the scene and later when impounded were illegal. Pretermitting whether Harper has standing to contest the stop and search of the Camry or the car's contents,[4] we find no merit in this contention.

(a) We consider whether the stop of the Camry was authorized.

> While the trial court's findings as to disputed facts in a ruling on a motion to suppress will be reviewed to determine whether the ruling was clearly erroneous, where the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review.[5]

> Although an officer may conduct a brief investigative stop of a vehicle, such a stop must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The U. S. Supreme Court recognized the difficulty in defining the elusive concept of what cause is sufficient to authorize police to stop a person, and concluded that the essence of the elusive concept was to take the totality of the

---

[2] Reed's conviction for kidnapping with bodily injury is not at issue in this appeal. See further footnote 44, infra.

[3] All five defendants joined in the suppression motion. It should be further noted that, before the trial began, the trial court ruled that given the number of co-defendants, "to make it easy," any objection raised by one defense attorney would preserve the issue as to all five defendants.

[4] See *Barnes v. State*, 269 Ga. 345, 348 (4) (496 SE2d 674) (1998) (because appellant had no reasonable expectation of privacy in his accomplice's truck, he lacked standing to challenge search thereof); *Burgeson v. State*, 267 Ga. 102, 105 (3) (b) (475 SE2d 580) (1996) (appellant could not assert a violation of Fourth Amendment rights in regard to the search of the car, where she had no proprietary interest in it or legitimate expectation of privacy regarding the vehicle or its contents); *State v. Williams*, 264 Ga. App. 199, 201 (590 SE2d 151) (2003) (vehicle passenger is entitled to the benefit of Fourth Amendment reasonableness requirements applicable to the temporary seizure of his person); *Tiller v. State*, 261 Ga. App. 363, 365 (582 SE2d 536) (2003) (passenger who asserts no possessory interest in the car or the items found within it lacks standing to challenge a search of the car directly).

[5] *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994) (citations omitted).

circumstances into account and determine whether the detaining officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity.[6]

Here, the patrol officer proceeding to the armed robbery scene witnessed a Camry run a stop sign. Even without any connection with the recent jewelry store heist, that Camry was thus subject to being stopped for a traffic violation.[7] The officer soon realized that the original getaway vehicle, the Buick, had been abandoned. At the suppression hearing, the officer recounted his experience in previous cases where perpetrators had abandoned an initial getaway vehicle for a second one. Recounting further the erratic maneuvers of the Camry, the officer testified that he had announced over police radio a BOLO for a black, four-door Toyota Camry and its traveling direction. Within two or three minutes of the BOLO, a nearby officer spotted a vehicle he believed matched the description. In addition, this second officer confirmed over police radio with the patrol officer that the sought-after Camry had shiny wheels, as did the one the second officer had spotted. "This detailed information provided the [officers] with the requisite articulable suspicion to warrant the investigative stop and detention" of the Camry.[8]

(b) Harper has failed to show that, as to him, the search of the Camry was illegal. As soon as the Camry stopped on the public roadway, Harper jumped out and ran away. Harper thereby abandoned, for Fourth Amendment purposes, any reasonable expectation of privacy as to the contents of the car or anything that had fallen outside.[9]

2. There is no merit in Harper's challenge to the statute proscribing kidnapping with bodily injury[10] on the ground that it is unconstitutionally vague because it does not define the term "bodily injury."[11]

---

[6] Id. at 320 (2) (citations and punctuation omitted).

[7] See *Pincherli v. State*, 295 Ga. App. 408, 412 (2) (a) (671 SE2d 891) (2008) (where law enforcement officer observes defendant violate a traffic law, stop of vehicle does not violate the Fourth Amendment or the Georgia Constitution); see also *Burgeson*, supra at 105 (3) (a) (probable cause can rest upon collective knowledge of police when there is some degree of communication between them).

[8] *Brown v. State*, 278 Ga. 724, 727 (2) (609 SE2d 312) (2004); see *Boone v. State*, 282 Ga. App. 67, 70 (2) (637 SE2d 795) (2006) (BOLO that described the truck's color, number of occupants, road of travel, and direction of travel provided officer with requisite articulable suspicion); *McNair v. State*, 267 Ga. App. 872, 874 (1) (600 SE2d 830) (2004).

[9] See *Burgeson*, supra at 106 (3) (b); *Young v. State*, 190 Ga. App. 775, 776 (380 SE2d 309) (1989).

[10] OCGA § 16-5-40.

[11] *Braley v. State*, 276 Ga. 47, 49 (3) (572 SE2d 583) (2002) ("bodily injury" is a term that

3. Harper contends that the trial court erred by allowing in evidence the videotape, arguing that the state failed to authenticate it as showing the armed robbery. A videotape is authenticated "by showing it is a fair representation of the object, scene, or person depicted."[12] Harper points out that the authenticating witness, the store manager, testified that he was lying down with his face on the floor while the jewelry was being taken. Therefore, Harper asserts, the store manager could not have seen the robbers' actions so as to attest that the videotape showed a fair representation of the robbery scene. Moreover, Harper cites a discrepancy between time stamps displayed upon the recorded images and the 3:00 p.m. time frame testified to by the store manager and other witnesses.

The store manager acknowledged that the time stamps displayed were incorrect and also that the videotapes pulled from the machines were not routinely checked, but viewed only when necessary. However, other than the clock not being correctly set, the manager testified, the surveillance camera system, including the recording machine, was operating properly on the date in question. He recalled further that he personally had loaded a blank tape into the recording machine that morning. The store manager further testified that he had viewed the videotape at issue and that various particulars captured thereon showed what he had seen that day, before and after he lay on the floor: masked men rushing into the store; resulting damage to the store's display cases and other property; hammers haphazardly left behind in the store; and the loss of jewelry items. In addition, the store manager testified that other events shown on the videotape were consistent with what he heard while lying on the floor, namely, the sound of breaking glass. Given the store manager's testimony, the trial court did not abuse its discretion in allowing the videotape in evidence.[13]

4. Harper contends that the trial court erred by denying a motion in limine to exclude evidence from which, he claims, the jury could have inferred that he was in possession of a stolen vehicle.

Initially, all five defendants were co-indicted for theft by receiving the Buick. Prior to trial, they sought to exclude any evidence that

---

is "commonly understood").

[12] *Walthall v. State*, 281 Ga. App. 434, 441 (2) (b) (636 SE2d 126) (2006) (citation omitted).

[13] See *Dawson v. State*, 283 Ga. 315, 317-319 (3) (658 SE2d 755) (2008) (where there was other evidence of authenticity, date-time stamp not reflecting actual time images were captured did not render videotape inadmissible, but went to weight to be given evidence); *Wade v. State*, 274 Ga. 791, 792 (4) (560 SE2d 14) (2002) (testimony of store employee who appeared on videotape from surveillance camera, together with testimony of store owner who had viewed tape and testified as to store's procedures regarding the surveillance camera, authenticated videotape); *Walthall*, supra at 440-441 (2) (b) (admission of evidence lies within the sound discretion of the trial judge and will not be disturbed absent an abuse of discretion).

the Buick had been stolen, reporting to the court that the state had not yet ascertained the whereabouts of the Buick's owner and arguing that, without the owner's testimony, any allegation that the Buick was stolen property when used as a getaway vehicle would amount to hearsay and impermissibly impugn their character. The trial court rejected their motion.

During trial, the state adduced the steps that law enforcement officers had taken to catch the perpetrators. One officer of the sheriff's department who had joined the patrol officer at the scene of the abandoned Buick testified about that car. He described — and it is this description that is at issue in this contention — that the left rear window had been "busted out," that the plastic shell of the steering column had been "busted off, knocked off," and that there were no keys in the vehicle, although its motor was running.

Although Harper points out that the trial court ultimately granted a directed verdict as to this count for all the defendants, that ruling does not show an abuse of discretion in allowing the cited description.[14] The officer's recollection of the condition of the apparently abandoned getaway vehicle was neither hearsay nor inadmissible character evidence; rather, the testimony described circumstances constituting part of the res gestae.[15] "[A]cts and circumstances forming a part or continuation of the main transaction are admissible as res gestae and it does not matter that the act is another criminal offense."[16] "The [s]tate is entitled to present evidence of the entire res gestae of a crime. This is so even if the defendant's character is incidentally placed in issue."[17]

5. Harper complains that the final charge to the jury did not include a specific instruction that venue was a material allegation of the indictment that must be proved beyond a reasonable doubt.[18]

Notwithstanding, the indictment clearly stated that the crimes were committed in Jackson County; the state presented direct evidence that the crimes were committed in Jackson County, the county in which the trial was held; the trial court gave a complete charge on reasonable doubt; and it instructed the jury that the crimes as alleged in the indictment must be proved beyond a reasonable doubt. Although a separate charge on venue would have been preferable, the absence of such a charge under these circum-

---

[14] *Walthall,* supra (regarding standard of review).

[15] See *Parks v. State,* 294 Ga. App. 646, 648 (2) (669 SE2d 684) (2008).

[16] Id. (citation omitted).

[17] *Corza v. State,* 273 Ga. 164, 166 (2) (539 SE2d 149) (2000) (citations omitted).

[18] See *Jones v. State,* 272 Ga. 900, 901 (2) (537 SE2d 80) (2000) (like every other material allegation in the indictment, venue must be proved by the prosecution beyond a reasonable doubt).

stances provides no basis for reversal.[19]

6. Harper contends that the trial court erred by rejecting his claim of ineffective assistance of counsel. To prevail on this claim, Harper was required to show the trial court that his counsel's performance was deficient and that the deficiency prejudiced his defense.[20] Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[21] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[22]

(a) Harper asserts that his trial lawyer failed to interview witnesses and otherwise adequately investigate the case. At the hearing on Harper's motion for new trial, he made no showing as to what any additional investigation would have produced. Consequently, Harper has made no showing that his trial counsel performed deficiently in that regard.[23]

(b) Harper also asserts that the trial lawyer performed deficiently by not requesting a charge on kidnapping as a lesser included offense of kidnapping with bodily injury. "Where, as here, the evidence establishes either the commission of the completed offense as charged, or the commission of no offense, the trial court is not authorized to charge the jury on a lesser included offense."[24] No deficient performance is shown by trial counsel's failure to request an unauthorized charge.[25]

### Case No. A09A1091

7. Williams contends that the trial court erred by denying the motion to suppress evidence seized from the Camry, arguing that the traffic stop and subsequent searches were illegal. We find no merit in this contention.

(a) Assuming, without deciding, that Williams had standing to contest the stop of the Camry, which belonged to the female driver,[26] we find no merit in Williams's argument that the stop of the Camry

---

[19] See *Shahid v. State*, 276 Ga. 543-544 (2) (579 SE2d 724) (2003).

[20] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[21] *Suggs*, supra at 88.

[22] Id.

[23] See *Crane v. State*, 294 Ga. App. 321, 325 (1) (b) (iv) (670 SE2d 123) (2008); *Hinkle v. State*, 282 Ga. App. 328, 329 (1) (638 SE2d 781) (2006).

[24] *Cotton v. State*, 274 Ga. 26, 27 (2) (549 SE2d 71) (2001) (citations omitted).

[25] See *Lupoe v. State*, 284 Ga. 576, 579 (3) (f) (669 SE2d 133) (2008) (trial counsel's failure to pursue futile motion cannot amount to ineffective assistance).

[26] See *Burgeson*, supra at 105 (3) (b); *Barnes*, supra at 348 (4); *Tiller*, supra at 365;

was not supported by reasonable, articulable suspicion of criminal activity.[27]

(b) We reject Williams's argument that the searches of the Camry were illegal. As soon as the Camry came to a stop, one of its occupants, Harper, jumped out and ran away. "Flight can be a significant factor in determining probable cause."[28] Williams, Reed, and the other two occupants who had remained seated in the Camry were ordered out of the vehicle. Such an order was authorized because

> when stopping individuals for questioning, law enforcement officers are entitled to take reasonable steps to protect their own safety. It is not unreasonable for officers stopping a car reportedly involved in numerous violent crimes to temporarily, and separately, detain the occupants.[29]

As the occupants exited the vehicle, a bandana, jewelry, and various other items fell to the ground. By that point, the officers had probable cause to arrest the occupants: about thirty minutes earlier, four black men concealing their faces with masks and bandanas had robbed a jewelry store 10.5 miles away; their original getaway vehicle, the Buick, had been hastily abandoned on the side of a road; the Camry had run a stop sign while erratically traveling in a direction away from the jewelry store and away from the Buick; a BOLO alert had resulted; a Camry matching the description in the BOLO had been stopped; there were four black men inside, one of whom had attempted to flee the Camry on foot; as the other occupants were removed, various objects fell to the ground; upon closer observation, an officer noted scattered on the ground just outside the Camry a bandana and numerous jewelry items.[30]

Having been lawfully arrested and having asserted no proprietary interests in the Camry, Williams is without standing to contest the subsequent searches of the vehicle.[31]

8. Williams contends that the trial court erred by admitting in

---

*Williams*, supra at 201.

[27] See Division 1 (a), supra.

[28] *Burgeson*, supra at 105 (3) (a) (citations omitted).

[29] *Brown*, supra at 727 (2) (citation omitted).

[30] See *Brown*, supra; *Boone*, supra at 71 (2).

[31] See *Burgeson*, supra at 105 (3) (b); *Barnes*, supra at 348 (4); cf. *State v. Menezes*, 286 Ga. App. 280, 282 (1) (648 SE2d 741) (2007) (noting that, because a passenger has standing to contest the passenger's own illegal seizure and detention in connection with a traffic stop, and because evidence or contraband discovered in a search of the car during the traffic stop may be considered the fruits of the passenger's illegal detention, the passenger may move to suppress the evidence or contraband and may thus indirectly challenge the search of the car).

evidence the videotape, arguing that the state failed to authenticate it because the authenticating witness was lying down during the robbery and thus could not see what was happening. There is no merit in this contention.[32]

9. Williams contends that the trial court erred by admitting evidence from which, he claims, the jury could have inferred that he was in possession of a stolen vehicle, specifically the Buick. He asserts the same arguments as did Harper, in which we have found no merit.[33]

10. Williams contends that he was denied a fair trial because the court allowed in evidence certain clothing items described as his property. The items were being stored for Williams by the county jail because, the state asserted at trial, he was wearing them at the time he was arrested and booked. Williams argues that the state failed to link him to the clothing items, and he complains that admission of the items was prejudicial because the items matched descriptions by eyewitnesses who had seen the clothing worn by the jewelry store robbers.

To link the clothing items to Williams (as well as other clothing items to the other defendants, including Reed[34]), the state presented the testimony of two county sheriff's office employees. The sheriff's office chief investigator, whose duties included overseeing the operations of the jail where Williams was transported upon his arrest, testified that when any suspect was booked, standard procedure required the collection of the suspect's personal clothing and the issuance of a uniform to the individual. The chief investigator further explained how the collected items were then stored and secured. Another investigator, who also was familiar with the procedure for booking individuals, testified that personal clothing was routinely collected from suspects during booking and then stored; that in the normal course of business, the jail created and maintained property receipts listing the personal clothing items collected from each booked suspect and further specifying the location of an inmate's stored items. Through this witness, the state introduced in evidence, pursuant to the business records exception, property receipts that itemized the personal property collected when Williams and the other defendants were booked.

On appeal, Williams specifically contends, "It is clear that the trial court was within its discretion to admit the property [receipts] *once a proper foundation ha[d] been laid.* . . . However, a proper

---

[32] See Division 3, supra.

[33] See Division 4, supra.

[34] See Division 16, infra.

foundation was not laid. . . ."[35] Williams points out that the chief investigator admitted that he had not personally collected and stored the clothing of any of the five defendants. Williams also points out that, similarly, the other investigator admitted that it had never been his duty to take care of an inmate's personal belongings and that he had not been present when the defendants' personal items were collected or stored away.

The investigators' admitted lack of personal knowledge, however, did not render the property receipts at issue inadmissible, but went only to the weight of that evidence.[36] The investigators' testimony provided an adequate foundation for the admission of the property receipts, which were properly admitted under the business records exception.[37] The trial court did not abuse its discretion in allowing in evidence the clothing items, because the state had demonstrated with reasonable assurance that they were collected from Williams (as well as other clothing items from the other defendants, including Reed[38]) during booking.[39]

11. Williams contends that the evidence was insufficient to sustain his conviction for kidnapping. He argues that there was no requisite showing of asportation under the standard set forth by the Supreme Court of Georgia in *Garza v. State*.[40] Therein, the Court overruled the "slight movement" standard for asportation and adopted a test requiring the assessment of four factors to determine

---

[35] (Emphasis in original.)

[36] See *Manley v. State*, 284 Ga. 840, 844 (1), n. 3 (672 SE2d 654) (2009) (property receipt, which specified the location from which a certain knife had originally been seized, was properly admitted under the business records exception); see also *Hurst v. State*, 285 Ga. 294, 297 (3) (676 SE2d 165) (2009) (testifying witness need not be the custodian of records to provide foundation for admission under business records exception, and any lack of independent recollection on testifying officer's part regarding creation of fingerprint card, considered a business record, went only to weight of evidence, not to its admissibility).

[37] See *Hurst*, supra; *Manley*, supra.

[38] See Division 16, infra.

[39] See *Hurst*, supra; *Manley*, supra; *Armstrong v. State*, 274 Ga. 771, 772-773 (2) (560 SE2d 643) (2002) (where the state seeks to introduce into evidence an item that is subject to the chain of custody rule, it must establish with reasonable assurance that the item seized is the same as the item being offered into evidence). The state points out that, unlike fungible articles, clothing items may be distinct and recognizable physical objects that can be identified by observation, thus eliminating the necessity of a chain-of-custody showing. *Pace v. State*, 271 Ga. 829, 840-841 (26) (524 SE2d 490) (1999) (because clothing items were non-fungible items that could be recognized by observation and because witnesses identified the clothing items as evidence found at crime scenes, such testimony authorized the jury to consider them). However, the state cites no such identification in this case.

[40] 284 Ga. 696 (670 SE2d 73) (2008). Subsequent to *Garza*, the kidnapping statute was amended. Because the amendment applies to crimes committed on or after July 1, 2009, it is inapplicable to this case. See *Brower v. State*, 298 Ga. App. 699, 706 (2), n. 3 (680 SE2d 859) (2009).

whether the movement at issue constituted asportation:

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.[41]

The Court in *Garza* instructed that an assessment of such factors would determine

> whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address — i.e., movement serving to substantially isolate the victim from protection or rescue — or merely a "criminologically insignificant circumstance" attendant to some other crime.[42]

Applying the four factors to the evidence here, it is clear that the approximately fifteen-foot movement of the store employee to the safe, which was located in the same jewelry showroom, did not constitute the necessary asportation to support a kidnapping conviction. The movement was of minimal duration and occurred during the course of and incidental to the armed robbery and aggravated assault crimes. And it did not significantly increase the danger the employee already faced as a victim of armed robbery and aggravated assault.[43] Accordingly, Williams's conviction[44] for kidnapping with bodily harm must be reversed.[45]

---

[41] *Garza*, supra at 702 (1) (citation omitted).

[42] Id. (citation omitted).

[43] See id. at 704 (3) (grabbing victim in house, forcing victim into an adjoining bedroom, and forcing victim to walk down hallway to retrieve items did not show asportation element of kidnapping).

[44] Neither Harper nor Reed included in their enumerations of errors any challenge to the sufficiency of the evidence with respect to their convictions for kidnapping with bodily injury. Reed did include such a challenge in his motion for new trial. And in pertinent part, the trial court ruled:

> [T]he court must grant a new trial on the kidnapping charge in order to charge the jury on the changed definition of asportation. In addition, under the evidence presented at trial, it is clear that the evidence produced at trial is insufficient to convict the defendant under the new *Garza* standard. . . . The court urges the state in light of *Garza* to nolle prosequi the kidnapping charge.

[45] See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979) (when an appellant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt) (citation and emphasis omitted); *Garza*, supra; *Crawford v. State*, 297 Ga. App. 187, 190 (1) (b) (676 SE2d 843) (2009); cf. *Henderson v. State*, 285 Ga. 240, 244-245 (5) (675 SE2d 28) (2009)

12. Williams contends that he was denied a fair trial, asserting that the trial court abused its discretion in refusing to sever his trial from Harper's. The decision whether to grant or deny a motion to sever is within the discretion of the trial court.[46]

> In exercising its discretion the trial court should consider the following three factors: (1) whether the number of defendants will create confusion of the law and evidence applicable to each defendant; (2) whether there is a danger that evidence admissible against one defendant will be considered against another despite cautionary instructions to the contrary; and, (3) whether the defenses of the co-defendants are antagonistic to each other.[47]

"The burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process."[48] Accordingly, "[t]he exercise of a trial court's discretion in denying a motion to sever will not be disturbed on appeal unless the defendant clearly demonstrates that he suffered prejudice by one or more of the above factors amounting to a denial of due process."[49]

Williams argues only that Harper asserted a defense antagonistic to his own. Williams's defense at trial was that, irrespective of whether he was in the Camry that was stopped, the state failed to prove beyond a reasonable doubt that he had been at the jewelry store and failed to so prove the extent of his participation, if any, in the crimes committed there.

According to Williams, Harper, however, pursued a defense that placed Williams at the armed robbery scene, named Williams as the gunman, and accused Williams of intimidating him (Harper) into going to the jewelry store and participating in the crimes committed there. Williams asserts that Harper launched this defense at the outset of trial, when Harper's lawyer detailed it to the jury during

---

(evidence authorized finding of asportation, where although the movement of the victims from one room to another within the duplex was of minimal duration, such movement was not an inherent part of the armed robbery, and in fact, occurred after the offense of armed robbery had been completed).

[46] *Kennedy v. State*, 253 Ga. 132, 134 (2) (317 SE2d 822) (1984).

[47] Id. (citations omitted).

[48] *Moss v. State*, 275 Ga. 96, 99 (2) (561 SE2d 382) (2002) (citations and punctuation omitted).

[49] *Kennedy*, supra.

opening statement:

> [Harper is] a young man, 19 years of age. . . . Chad Neal Harper comes to you and he admits that he was in that jewelry store. He admits that he was in the car when it was stopped out on I-85. But the story that Chad Neal Harper is going to tell you is that he was forced to do that, that one of the defendants in this case, Kelvin Williams, picked him up, a person to whom he owes money — I'm not going [sic] get into all the details; you'll hear his testimony — and showed him a gun and said, "This is the way that you're going to pay me back or else." And he had that gun in his possession, threatening Chad Neal Harper all the way through this episode. So I'm not going to be up here because I am not going to challenge hardly any of the evidence that the State puts on. Pretty much, in our opinion, what the police officers are going to get on that stand and say is going to be pretty much what happened, what is the truth in regard to what took place at the jewelry store. But the thing that I want you to keep in mind is that there will be no evidence that the State will be able to put up to disprove that Chad Neal Harper was not coerced or threatened into participating in this armed robbery. This is no team game. We're not here to play team ball. We are here to tell you the truth. And the way that you're going to have to judge the truth is that when Chad Neal Harper gets on the stand he's going to be examined by the District Attorney, he's going to be examined by all the fine attorneys here in this courtroom. And if he is lying, out of all these fine attorneys in this courtroom, then you'll be able to see the truth. . . . When Chad Neal Harper gets on the stand, you're going to have to look him into the eye and hear what he's got to say, and say, "Is this 19-year-old young man telling the truth?" . . . Gang threats and those type of things that make young kids threaten other kids to do things — if sometimes they don't do them they get shot down for not doing them. That is what's happening in our society today, and that is what happened in this armed robbery with Chad Neal Harper. So you be the judge of the facts, and you determine whether this young man had the opportunity at any time while that gun was in the possession of Kelvin Williams to run, whether his life was in danger, whether he felt like he had no alternative to do no more than what he did. We didn't come here to play team ball. We came here to tell you what the truth is. And I think when you judge the facts and you hear Chad

Harper's testimony you will find that he was coerced. And you say that's far-fetched. But I think the other day — we probably all saw it. But I can't remember what state. It may have been in Georgia. But a young guy that was delivering pizza went and robbed a bank. And before he could tell his story, he was blown up. You never knew what the truth was. Was he coerced into robbing that bank? Did somebody put a gun on him and send him to the bank and say, "Either rob them or I'll blow you up?" Well, Chad Neal Harper, on the threat of a gun — "You help participate in this crime or I'm going to shoot you. I'm going to kill you." Did he have a choice? We maintain that he did not. . . . Our defense is he was coerced.

Later, after the state had presented its case and the court had advised the defendants concerning the right to testify or not, Harper, consistent with the promise his counsel had made during opening statement, told the court that he wanted to testify. However, after his four co-defendants told the court that they were electing not to testify, Harper told the court that he no longer wanted to testify. Given this departure from what Harper's lawyer had detailed to the jury during opening statement, Harper's co-defendants moved for severance again,[50] as well as mistrial, proposing that the trial should continue only as to Harper. They argued that with Harper exercising his right not to testify, they were without any way to rebut the claims detailed by Harper's lawyer during opening statement. They also complained that, in questioning the state's witnesses, Harper's lawyer had alluded to coercion, intimidation, and other such factors that he had raised in opening statement. The court denied the motions.

Although Williams acknowledges that opening statements are not evidence (as the trial court so charged the jury), he points out that the Supreme Court of Georgia has instructed: "The requisite prejudice may exist . . . where the defendants *assert* defenses antagonistic to one another."[51] Williams thus contends that, although Harper's lawyer's remarks did not constitute evidence, in the jury's mind, the remarks may have been the equivalent of testimony that

---

[50] Pretrial, the defendants sought severance of their trials to eliminate possible prejudice. During the state's case, one of the defense attorneys renewed his motion to sever, asserting that there were antagonistic defenses. The other four attorneys also renewed their motions. The last attorney added, "Your Honor, I'll just remind you that you said earlier that unless noted otherwise one objection applies to everyone." The court affirmed, "That's correct," then denied "the renewed motion to sever for all Defendants." See footnote 3, supra.

[51] *Walker v. State*, 282 Ga. 703, 705-706 (3) (653 SE2d 468) (2007) (citation omitted; emphasis supplied).

Harper had made statements that Williams had committed (and forced him to commit) the crimes at the jewelry store.[52] Williams complains that the lawyer's opening remarks and subsequent conduct of Harper's defense directly inculpated him in a form not subject to cross-examination by him, given Harper's unpredicted change of mind not to deliver the promised testimony.[53] Williams maintains that he was thus denied his constitutional right of confrontation.[54]

In light of cases by the Supreme Court of Georgia, *Owen v. State*[55] and *Character v. State*,[56] we conclude that Williams has shown no reversible error. In *Owen*,[57] the Court addressed whether a trial court had abused its discretion in denying a severance.[58] There, none of the co-defendants took the stand.[59] The appellant in *Owen*, like Williams, argued on appeal that she had been unable to cross-examine her alleged accomplice/co-defendant with regard to an antagonistic defense based on the opening statement of her co-defendant's counsel.[60] Rejecting that argument, the Court gave its reasoning:

> No such evidence [as mentioned during the opening statement] was introduced at trial. Of course, the opening statement was not evidence (and the trial court so instructed the jury). Thus, it cannot be said that [the co-defendant] introduced an antagonistic defense; or that

---

[52] See generally *Douglas v. Alabama*, 380 U. S. 415, 419 (85 SC 1074, 13 LE2d 934) (1965) (Although Solicitor's reading of an alleged accomplice's statement, together with refusal of alleged accomplice to answer whether he had made such statement, "were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that [the alleged accomplice] in fact made the statement[.]") (citations omitted), cited in *Bruton v. United States*, 391 U. S. 123, 127 (88 SC 1620, 20 LE2d 476) (1968).

[53] See *Douglas*, supra at 419-420 (since Solicitor was not a witness, inference from his reading that alleged accomplice made the statement could not be tested by cross-examination; effective confrontation of alleged accomplice was possible only if he affirmed the statement as his, but alleged accomplice did not do so, relying on his privilege to refuse to answer Solicitor's questions).

[54] See id.; *Bruton*, supra at 137 (where co-defendant does not testify, introduction of co-defendant's confession inculpating the accused violates the *right of* cross-examination, notwithstanding clear instructions to the jury to disregard co-defendant's inadmissible hearsay evidence); *Moss*, supra at 98 (2) (recognizing *Bruton* as excluding statements by a nontestifying co-defendant that directly inculpate the defendant, based upon Confrontation Clause); see further *Castillo v. State*, 281 Ga. 579, 585 (7) (b) (642 SE2d 8) (2007) (upholding denial of motion to sever, where, among other findings, "there was no *Bruton* problem").

[55] 266 Ga. 312 (467 SE2d 325) (1996).

[56] 285 Ga. 112 (674 SE2d 280) (2009).

[57] Supra.

[58] Id. at 313-314 (2).

[59] Id. at 313 (2).

[60] Id. at 314 (2).

[appellant] was harmed by her inability to cross-examine [her co-defendant].[61]

In *Character v. State*,[62] the Supreme Court of Georgia rejected the appellant's contention that the trial court abused its discretion in denying a severance, determining that "the refusal to sever was harmless considering the overwhelming evidence that [the appellant] participated as a party to the crimes in question."[63] Similarly, in the instant case, the evidence was overwhelming that Williams was a party to the crimes of aggravated assault and armed robbery for which he was convicted.[64] Less than thirty minutes after the armed robbery at the jewelry store and within 10.5 miles of the store, Williams, along with three other individuals, all the same race and gender as the four armed robbers, were caught in a car with a significant amount of the store's merchandise, as well as a weapon and other tools (masks, gloves, bags, etc.) of the types used during the robbery. In addition, the evidence showed that Williams was wearing clothing items matching those worn by one of the perpetrators at the jewelry store. Moreover, while the state did not show that the officers, when pursuing the Camry, had been informed that the Camry had been at the jewelry store, the state called a witness at trial who so placed the Camry. According to that witness, a "dark green, older model Camry"[65] had closely followed the Buick out of the store's parking lot, also traveling at a high rate of speed.

### Case No. A09A1833

13. Reed contends that the trial court erred by denying the motion to suppress evidence seized from the Camry, arguing that the

---

[61] Id. Notably, in Williams's case, no prejudice could be shown because the complained-of remarks during opening statements did not constitute evidence. However, in cases where antagonistic defenses were asserted by way of *competent* evidence, the appellants still could not show prejudice because competent evidence may be challenged. See, e.g., *Heard v. State*, 274 Ga. 196, 199 (5) (552 SE2d 818) (2001) ("appellant has not shown the necessary clear prejudice since, even if the motion to sever had been granted, the co-defendant could have given the same testimony at appellant's separate trial"); *Adams v. State*, 271 Ga. 485, 486 (2) (521 SE2d 575) (1999) (no prejudice amounting to a denial of appellant's due process protection is demonstrated by the circumstance that an accomplice, who is subject to cross-examination, takes the stand and blames the appellant or attributes to him a greater degree of culpability than the accomplice himself bears, because accomplice was subject to cross-examination by appellant); *Kennedy*, supra at 135 (2) (same).

[62] Supra.

[63] Id. at 118 (5).

[64] The final charge included instructions pertaining to party to a crime.

[65] One of the county deputies who had heard the BOLO and soon spotted the Camry on the interstate testified that, from afar, the Camry appeared black. That officer was later at the traffic stop. He testified that, at close range, it was apparent that the Camry was "a real dark green color."

traffic stop of the vehicle was illegal. There is no merit in this argument.[66]

14. Reed contends that the trial court erred by admitting in evidence the videotape, arguing that the state failed to authenticate it because the authenticating witness was lying down during the robbery and thus could not see what was happening. There is no merit in this contention.[67]

15. Reed contends that the trial court erred by denying the motion in limine to exclude evidence from which, he claims, the jury could have inferred that he was in possession of a stolen vehicle, specifically the Buick. He asserts the same arguments as did Harper, in which we have found no merit.[68]

16. Reed contends that the trial court erred by allowing in evidence clothing items, which the state claimed he was wearing at the time of his arrest and booking. Reed asserts essentially the same arguments as did Williams, in which we have found no merit.[69]

17. Reed contends that the trial court erred by denying his motion to sever his trial from Harper's, arguing that Harper asserted a defense antagonistic to his own. Like Williams, Reed's defense at trial was that, irrespective of whether he was in the Camry that was stopped, the state failed to prove beyond a reasonable doubt that he had been at the jewelry store and that he had participated in the crimes committed there. Reed asserts further that the opening statement given by Harper's lawyer implicated him as a participant in the robbery.

Reed claims that the lawyer's remarks were unfairly prejudicial to the same extent as hearsay — the jury heard it, yet the accused has no opportunity to cross-examine the declarant. Citing *Bruton*,[70] Reed argues that a jury instruction that a lawyer's statements do not constitute evidence could not reasonably be expected to negate statements attributed to a nontestifying co-defendant. And according to Reed, there was no direct evidence tying him to the crimes committed at the jewelry store.

As with Williams, the state's evidence against Reed was overwhelming for the crimes of aggravated assault and armed robbery.[71] Even if Reed's and Harper's defenses could be construed as antago-

---

[66] See Division 1 (a), supra; see Division 7 (a), supra.

[67] See Division 3, supra.

[68] See Division 4, supra.

[69] See Division 10, supra.

[70] Supra.

[71] See Division 12, supra.

nistic,[72] in light of *Owen*,[73] *Character*,[74] and the overwhelming evidence against Reed, we find no reversible error.

*Judgments affirmed in Case Nos. A09A0878 and A09A1833. Judgment affirmed in part and reversed in part in Case No. A09A1091. Smith, P. J., and Bernes, J., concur.*

DECIDED NOVEMBER 5, 2009.

*Elrod & Elrod, Christopher D. Elrod*, for appellant (case no. A09A0878).

*William H. Kitchens*, for appellant (case no. A09A1091).

*Shelley Welch Cox*, for appellant (case no. A09A1833).

*James B. Smith, District Attorney, Richard K. Bridgeman, Robin R. Riggs, Assistant District Attorneys*, for appellee.

---

[72] *Kennedy*, supra at 134 (2) (an appellant's allegation that his co-defendant's statement spilled over to his case and prejudiced him may not amount to clear showing of prejudice and denial of due process necessary to require a severance).

[73] Supra.

[74] Supra.