S12A0154. HUMPHREY v. LEWIS.
(728 SE2d 603)

THOMPSON, Justice.

Christopher K. Lewis was convicted of malice murder, burglary, and other related offenses in 1998, and he was sentenced to death for the murder. After reversing and remanding for a new hearing on Lewis' motion for new trial, see *Lewis v. State*, 275 Ga. 194 (565 SE2d 437) (2002) (*Lewis I*), this Court unanimously affirmed Lewis' convictions and sentences in 2004. See *Lewis v. State*, 277 Ga. 534 (592 SE2d 405) (2004) (*Lewis II*). After Lewis filed a petition for a writ of habeas corpus, the habeas court granted Lewis habeas relief with

respect to his malice murder conviction and death sentence. See *Hall v. Lewis*, 286 Ga. 767, 768 (692 SE2d 580) (2010) (*Lewis III*). The warden appealed only the habeas court's grant of relief as to Lewis' murder conviction, and this Court reversed that portion of the habeas court's order and remanded the case to the habeas court for consideration of several unresolved claims that Lewis had raised in his amended petition. See id. at 784 (II) (D), (III). In accordance with the directions from this Court, the habeas court on remand ruled on Lewis' remaining claims in an order filed on August 17, 2011. The habeas court again granted Lewis habeas relief, this time vacating all of Lewis' convictions on several grounds. The warden appeals. For the reasons that follow, we reverse the habeas court's ruling and reinstate Lewis' convictions.

I. *Factual Background*

The evidence adduced at trial showed the following. Lewis and the victim, Cheryl Lewis, were married but had been living apart for approximately a year, and there were several incidents of domestic violence over that time. Ms. Lewis and her two children from a previous marriage, 13-year-old Kellee Dunn and 10-year-old Sean Dunn, were staying with a friend in her apartment. On December 19, 1996, the children were alone in the apartment while Ms. Lewis was attending a Christmas party with a male co-worker, Robbie Epps. At approximately 11:00 p.m., Lewis began banging on the apartment door, cursing and yelling, but the children did not open the door pursuant to their mother's instructions. Eventually, the banging ceased, and the children went to sleep.

At 1:45 a.m., Kellee was awakened by her mother's screams and went to a bedroom, where she saw Lewis holding a knife over her mother, who was on the floor. Kellee ran next door to call the police. When the police arrived, they found Epps standing in the parking lot. Appearing frightened and intoxicated, Epps told police that there was a man in the apartment. Police discovered Ms. Lewis' body inside. She had suffered 42 injuries and had bled to death because her carotid artery and jugular vein had been severed. After Kellee identified Lewis as her mother's attacker, police went to Lewis' apartment complex and arrested him in the parking lot. DNA taken from bloodstains on Lewis' shoe and pants matched Ms. Lewis' DNA profile.[1]

---

[1] For a more-detailed description of the facts of the crimes and the evidence against Lewis, see *Lewis III*, 286 Ga. at 768 (I), and *Lewis II*, 277 Ga. at 535-536 (1).

## II. *Standard of Review*

"In reviewing the grant or denial of a petition for habeas corpus, this Court accepts the habeas court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the law to the facts." (Citation omitted.) *Henderson v. Hames*, 287 Ga. 534, 536 (2) (697 SE2d 798) (2010).

## III. *Brady Claim*

The warden contends the habeas court erred in granting Lewis relief on his claim that the State suppressed evidence in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). The habeas court found the State violated *Brady* in its suppression of two pieces of evidence, namely: (1) notes reflecting an out-of-state investigator's interview with Ms. Lewis' roommate, Kimberly Silinzy, regarding Lewis' relationship with Ms. Lewis; and (2) a Georgia Bureau of Investigation (GBI) report stating that Lewis' shoe did not make a bloody shoe print found at the crime scene.

The warden correctly points out that the habeas court failed to address the fact that Lewis' *Brady* claim was procedurally defaulted, at least as an initial matter, because he did not raise it at trial or on direct appeal. See *Turpin v. Todd*, 268 Ga. 820, 824 (2) (a) (493 SE2d 900) (1997); OCGA § 9-14-48 (d). However, a petitioner may overcome procedural default by satisfying the cause and prejudice test. See *Todd*, 268 Ga. at 824 (2) (a). We need not decide whether Lewis can show cause to excuse the procedural default to his *Brady* claim, see id. at 824-827 (2) (a) (finding cause to excuse a procedural default where the State breached a "constitutional duty" to disclose information forming the basis of the claim), because we are satisfied that Lewis has failed to establish the requisite prejudice. See *Waldrip v. Head*, 279 Ga. 826, 829-830 (II) (B) (620 SE2d 829) (2005) (rejecting a petitioner's attempt to avoid procedural default regarding certain alleged *Brady* violations because prejudice was not established).

> Because [Lewis'] underlying claim is a constitutional claim involving the denial of his due process rights under the Fourteenth Amendment, *Brady*, 373 U. S. at 86, the underlying claim and the prejudice analysis necessary to satisfy the cause-and-prejudice test are coextensive.

(Citation omitted.) *Schofield v. Palmer*, 279 Ga. 848, 851 (2) (621 SE2d 726) (2005). For the reasons discussed below, Lewis cannot prevail on the merits of his underlying *Brady* claim, and therefore, his claim remains procedurally defaulted.

To prevail on his *Brady* claim, Lewis must show, inter alia, that the allegedly-suppressed evidence was material to the defense. " 'The evidence is material only if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (Citation omitted.) *Upton v. Parks*, 284 Ga. 254, 255 (1) (664 SE2d 196) (2008).

A. *Silinzy Notes*

Lewis claims the State suppressed handwritten notes regarding an out-of-state investigator's interview with Silinzy. The investigator spoke with Silinzy when he served her with a witness subpoena shortly before Lewis' trial began. Quoting from the notes in its order, the habeas court found that the notes indicated the investigator learned that Lewis " 'came to [the] apartment,' " that Ms. Lewis " 'left w[ith] him,' " and that " 'she slept w[ith] him 2 weeks prior to [her] murder.' " The habeas court also found the notes reflected that Silinzy told the investigator that she had " 'never heard any threats' " made by Lewis to Ms. Lewis and that Ms. Lewis told Silinzy that " 'she was scared of [Lewis], but that she still loved him.' " The habeas court further found that, as a result of the State's suppression of this evidence, Lewis was deprived of "critical third-party evidence of the true nature of the relationship between him and his wife" that would have led competent counsel to investigate a voluntary manslaughter theory rather than the "unsupported" theory of actual innocence that trial counsel pursued at trial. The habeas court concluded that "on its own the Silinzy evidence create[d] a reasonable probability that the jury would have decided Mr. Lewis's case differently" in that it would have returned a voluntary manslaughter verdict.

However, the same information contained in the investigator's notes is also contained in Silinzy's affidavit submitted by Lewis in his habeas proceeding. In *Lewis III*, this Court thoroughly addressed whether there was a reasonable probability that presenting the testimony in Silinzy's affidavit at Lewis' trial would have affected the outcome of the trial. Considering Silinzy's affidavit in the context of the entire evidence presented at trial and in the habeas court and assuming Lewis could establish the admissibility of any hearsay evidence, we specifically held that, for various reasons, there was no reasonable probability that the outcome of Lewis' trial would have been different had trial counsel presented the testimony contained in Silinzy's affidavit, including her testimony that she never witnessed any domestic violence by Lewis against Ms. Lewis, that Lewis and Ms. Lewis had sexual relations approximately two weeks before the crime, that Ms. Lewis loved Lewis but did not want to live with him when he was on drugs, and that the couple had an "on-going" relationship. See *Lewis III*, 286 Ga. at 776-778 (II) (C) (2). Therefore, the habeas court's current finding that there is a reasonable probability that the outcome of Lewis' trial would have been different if

the defense had possessed the Silinzy evidence conflicts with this Court's holding in *Lewis III*.[2]

Nevertheless, the habeas court did not find our decision in *Lewis III* to be determinative of Lewis' *Brady* claim regarding the Silinzy notes for the reason that this Court "only considered the Silinzy evidence in isolation, not the chain of evidence that would have been uncovered had the defense investigated a voluntary manslaughter defense." However, the habeas court failed to specify what additional evidence would have resulted from Lewis' possession of the Silinzy notes at trial.

Moreover, in *Lewis III* the warden appealed the habeas court's finding that Lewis' appellate counsel were ineffective in failing to raise on appeal trial counsel's ineffectiveness in not choosing to pursue a voluntary manslaughter theory, and thus, our analysis required us "to determine whether, but for the alleged deficiencies of Lewis' trial counsel, there [wa]s a reasonable probability that the jury would have returned a voluntary manslaughter verdict rather than a malice murder verdict." *Lewis III*, 286 Ga. at 770 (II) (A). "In order to conduct such an analysis, it [wa]s necessary to look both at the evidence actually presented at trial and the evidence available to trial counsel that they failed to present." Id.

Because one of trial counsel's alleged deficiencies was the failure to present evidence supporting a voluntary manslaughter theory, this Court considered all of the evidence presented in the habeas proceeding that Lewis argued supported that theory, including evidence countering the State's portrayal of Lewis and his relationship with the victim. After addressing the prejudicial impact of that evidence both item by item, see *Lewis III*, 286 Ga. at 772-781 (II) (C) (1)-(4), and collectively, see id. at 783 (II) (D), "we [we]re not persuaded that, had the jury heard the evidence presented in the habeas court, there [wa]s a reasonable probability that it would have convicted Lewis of voluntary manslaughter instead of malice murder even had it been presented with that choice." Id.

---

[2] The habeas court "respectfully disagree[d]" with our conclusions in *Lewis III*, finding that the Silinzy evidence would have undermined the State's evidence "that Mrs. Lewis had been trying to stay away from Mr. Lewis since the domestic disturbances[,] regardless of what conclusions the jury might have made about what happened after Mr. and Mrs. Lewis slept together." However, at trial the State acknowledged that, even after the domestic disturbances, "the couple had had an 'off-again and on-again relationship' until approximately two weeks before the murder when, in an attempt to end the relationship, Ms. Lewis had refused to let Lewis into her apartment or to respond to his pages." *Lewis III*, 286 Ga. at 771 (II) (B). "During the two weeks prior to the crime, Lewis regularly came by Ms. Lewis' apartment and banged on the door, and he filled her pager with his pages. *While Ms. Lewis had previously allowed Lewis back into her life, the State argued that this time she refused to do so.*" (Emphasis supplied.) Id.

Therefore, again considering the Silinzy evidence, this time as it is contained in the investigator's notes, and evaluating it in light of Lewis' *Brady* claim, we reach the same conclusions as we did in *Lewis III* for the same reasons we articulated there. Accordingly, the Silinzy notes do not have any significant effect on our assessment of materiality in support of Lewis' overall *Brady* claim or on our assessment of prejudice in support of his attempt to overcome the procedural default to that claim.

B. *GBI Report*

Lewis also claims the State suppressed a letter from the district attorney in his case to the GBI asking the agency to determine whether a bloody shoe print located on a sheet taken from the crime scene matched Lewis' shoe and the GBI's report in response finding that there was "sufficient evidence to conclude that [Lewis'] shoes did not make the questioned impressions." The habeas court found a reasonable probability that the result in Lewis' trial would have been different had the Silinzy and GBI evidence been disclosed to the defense, because the evidence, when considered collectively, would have led the jurors to question whether the police had fully investigated the crimes or had ignored evidence that pointed to another perpetrator.

A review of the trial transcript shows the bloody shoe print was identified in a photograph of the crime scene by GBI Special Agent Sam House, the crime scene specialist who took the photograph as part of his processing of the crime scene. Agent House testified the bloody shoe print was on a sheet lying in the entrance to the bedroom where Ms. Lewis' body was found. After Agent House identified the shoe print, the following exchange between the district attorney and Agent House took place:

Q. Now I want to make sure for the jury that they understand, all these pictures are taken after all the different people have come into the crime scene, is that correct?

A. Correct.

Q. All right, so after the E.M.T.'s, is that one, after the various detective [sic], after the children or perpetrator, all these people, is that correct?

A. Now I don't recall that I was notified as to how many people had been in the scene but there were numerous personnel that had been in the scene prior to my arriving and doing the photographing.

Thus, the State expressly pointed out to the jury that the presence of the shoe print was not photographically documented until after a number of people had entered the crime scene. Furthermore, there was no evidence presented at trial, and Lewis has presented none in the habeas court, to indicate that the shoe print was observed at any time before numerous individuals had been on the crime scene. Therefore, the jury was authorized to infer from Agent House's testimony that the shoe print could have belonged to any of several individuals who obviously had nothing to do with the commission of Ms. Lewis' murder, including: Kellee, who ran upstairs and into the room where her mother's body was located as soon as the police arrived; the first police officer on the scene, who followed her; or emergency medical personnel.

Although Agent House testified it was "standard" in homicide investigations for various personnel to enter the scene prior to his arrival, this testimony also allowed the jury to infer the crime scene had not been promptly secured and thus, provided defense counsel with an opportunity to attack the crime scene investigation. Indeed, we noted in *Lewis III* that Lewis' trial counsel "pointed out the State's failure to address certain issues, including *Epps's location at the time of the attack and the identity of a partial bloody shoe print found on a sheet at the entrance to the room where the body was found*." (Emphasis supplied.) *Lewis III*, 286 Ga. at 783 (II) (C) (5).

Trial counsel also took advantage of several other opportunities to attack the investigation and to point to Epps as the possible perpetrator. In holding in *Lewis III* that trial counsel were not ineffective in choosing and presenting an actual innocence theory, we stated the following:

Trial counsel sought to create a reasonable doubt in the minds of the jurors that Lewis had committed the murder by attacking the police investigation of the crime scene . . . by showing that Lewis had very little blood on him at the time of his arrest despite the large amount of blood at the crime scene; and by suggesting that Epps had committed the crime, had quickly showered in the upstairs bathroom, and had then run outside just before the police arrived. . . .
. . . Trial counsel also attacked the investigation of the case through the cross-examination of the State's witnesses. . . . During the police investigators' cross-examination, [trial counsel] elicited testimony that they had approached

the crime scene believing that the perpetrator had already been identified and that he had little time for clean-up, allowing [trial counsel] to argue that the police had failed to thoroughly check the bathrooms for evidence that someone had washed up there and had failed to adequately inspect Epps for evidence that he could have been involved in the murder.

. . . [Defense investigator and blood spatter expert Patrick] Coffey also attacked the investigation of the crime scene, pointing out, for instance, that blood samples should have been taken at different locations throughout the crime scene to determine whether there was more than one blood type present, because it was likely that the perpetrator was also injured in the struggle.

During rebuttal of Coffey's testimony, the State's witness defended the police investigation of the case by explaining that the police had been told the identity of the perpetrator when they arrived on the scene, and, thus, they were not dealing with "a who-done-it scene that would demand an entire scene processing." . . . [Trial counsel] was . . . able to use this rebuttal testimony in making his closing argument to the jury.

*Lewis III*, 286 Ga. at 782-783 (II) (C) (5).

Given the significant attack that defense counsel actually mounted against law enforcement's investigation of Epps and the crime scene and considering the fact that it was expressly pointed out to the jury that the crime scene photograph in which the shoe print appeared was taken after numerous individuals had entered on the scene, the GBI report does not have any significant effect on our assessment of materiality in support of Lewis' overall *Brady* claim or on our assessment of prejudice in support of his attempt to overcome the procedural default to that claim.

C. *Collective Materiality of Allegedly-Suppressed Evidence*

Considering the investigator's notes regarding the Silinzy interview and the GBI report collectively, we conclude there is no reasonable probability that the result of Lewis' trial would have been different had the allegedly-suppressed evidence been disclosed to the defense. See *Kyles v. Whitley*, 514 U. S. 419, 436 (III) (115 SC 1555, 131 LE2d 490) (1995) (multiple alleged violations of *Brady* must be considered collectively). Because Lewis cannot make that showing, we conclude both that Lewis' underlying *Brady* claim lacks merit and that he has failed to overcome the bar to that claim arising out of

procedural default. Therefore, the habeas court erred in granting Lewis relief on this claim.

IV. *Trial Court's Refusal to Instruct on Voluntary Manslaughter*

The warden also contends the habeas court erred in granting Lewis habeas relief on the ground that the trial court erred when it refused to instruct the jury on the offense of voluntary manslaughter. Trial counsel filed a written request for a voluntary manslaughter charge, but the trial court denied his request, finding there was no evidence of provocation before the jury. Trial counsel properly preserved the issue for appeal. However, Lewis' appellate counsel did not present the question of whether the trial court erred in failing to charge the jury on voluntary manslaughter in Lewis' direct appeal, and thus, this claim is procedurally defaulted. See *Todd*, 268 Ga. at 824 (2) (a); OCGA § 9-14-48 (d). The habeas court summarily stated that Lewis had overcome the procedural default to this claim by establishing that appellate counsel's failure to raise and litigate the issue of the trial court's failure to provide a voluntary manslaughter jury charge was deficient performance and that appellate counsel's deficient performance prejudiced Lewis. See *Todd*, 268 Ga. at 824-829 (2) (a), (b) (successful ineffective assistance claim satisfies both prongs of cause and prejudice test).

Under a proper analysis of an ineffective assistance of appellate counsel claim, the petitioner bears the burden of showing "that appellate counsel was deficient in failing to raise an issue on appeal and that the deficiency prejudiced the defense." *Nelson v. Hall*, 275 Ga. 792, 793 (573 SE2d 42) (2002) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984)). The warden argues that the proper inquiry in determining prejudice here is whether, had the trial court given a voluntary manslaughter charge, a reasonable probability exists that the outcome of Lewis' trial would have been different. See *Wadley v. State*, 258 Ga. 465, 466-467 (369 SE2d 734) (1988) (assuming for purposes of defendant's ineffective assistance claim that there was "some evidence" to authorize a charge on voluntary manslaughter yet finding the defendant was not prejudiced, because the evidence did not raise a reasonable probability that a jury would have returned a voluntary manslaughter verdict).

In *Wadley*, however, the petitioner asserted *trial* counsel's error in failing to preserve the issue of the trial court's failure to give a voluntary manslaughter charge. Under those circumstances, i.e.,

> when a defendant raises an ineffectiveness claim based on [trial] counsel's failure to except to certain jury charges or to preserve the right to do so on appeal, the defendant must show that the charges in question were erroneous and that,

if proper charges had been given, there is a reasonable probability that the result of the *trial* would have been different.

(Emphasis supplied.) *Peavy v. State*, 262 Ga. 782, 783 (2) (425 SE2d 654) (1993) (citing *Wadley*, 258 Ga. at 466-467). See *Waldrip*, 279 Ga. at 834 (III) ("the likelihood of a different result at trial if error is corrected by proper objection by counsel, rather than the likelihood of reversal on appeal, is the proper inquiry in an ineffective assistance of *trial* counsel claim") (emphasis supplied) (also citing *Wadley*, supra).

In Lewis' case, the issue is the ineffective assistance of *appellate* counsel. In order to establish the prejudice prong of an ineffective assistance of *appellate* counsel claim, "the [petitioner] must show 'a reasonable probability that the outcome of the *appeal* would have been different.'" (Citations omitted; emphasis supplied.) *Nelson*, 275 Ga. at 794. Therefore, the proper inquiry here is whether Lewis can show a reasonable probability that he would have succeeded on a claim that the trial court erred in denying his written request for a charge on voluntary manslaughter had his appellate counsel raised that claim on direct appeal.

A charge on voluntary manslaughter must be supported by evidence that the defendant "act[ed] solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a). See *Reynolds v. State*, 271 Ga. 174, 175 (3) (517 SE2d 51) (1999). Lewis' defense at trial was that he did not kill Ms. Lewis but, instead, discovered her body as she lay dead or dying. However, the habeas court found that evidence submitted by the State, namely, that two condom packages, one of which had been opened, were located in the bedroom where Ms. Lewis and Epps were prior to the attack, that Ms. Lewis was wearing only a night shirt at the time of her death, and that Epps met the police in the parking lot of the apartment complex clad only in his boxer shorts in frigid weather and told the officer "that there was some man upstairs" in Ms. Lewis' apartment, provided the evidence of provocation which demanded the giving of an instruction on voluntary manslaughter.

While adulterous conduct can be the provocation sufficient to warrant a conviction for voluntary manslaughter, *Strickland v. State*, 257 Ga. 230, 231-232 (2) (357 SE2d 85) (1987), and the evidence presented by the State may have led to an inference of adulterous conduct on the part of Ms. Lewis, the evidence did not show that Lewis had learned of such conduct immediately prior to the killing so as to constitute the provocation that might incite a sudden passion.

See *Culmer v. State*, 282 Ga. 330 (4) (647 SE2d 30) (2007). Neither Lewis nor Epps testified at trial, and neither Lewis nor the State presented any evidence indicating that Lewis saw Epps in the apartment or learned of any adulterous conduct immediately prior to the attack. Rather, the State's evidence showed that, after threatening and harassing Ms. Lewis and her children in the days and hours preceding the crimes, Lewis climbed over the fence surrounding the back patio of the apartment where Ms. Lewis and her children were staying and burglarized the apartment in the middle of the night by standing on a gas pipe, prying open the lock from a kitchen window four feet off the ground, and climbing through an opening approximately 15 inches by 33 inches onto the kitchen counter. Evidence established Lewis then made his way from the kitchen to the dining room, through the hallway, across the living room, and up the stairway to the first room at the top of the stairs,[3] where he met and killed Ms. Lewis.

Thus, because neither Lewis' nor the State's evidence tended to show a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person, the trial court did not err in refusing to give the requested charge. See *Culmer*, supra, 282 Ga. at 335 (4) (voluntary manslaughter charge was not warranted, even though the defendant argued that evidence supporting the State's theory of the case provided evidence of provocation, where State's evidence did not show that defendant learned of victim's alleged adulterous conduct immediately before the killing or that victim recounted it to defendant at the time of the killing).

Accordingly, Lewis cannot show that, but for appellate counsel's failure to raise this issue on appeal, there is a reasonable probability that the outcome of his appeal would have been different, and thus, he cannot show ineffective assistance of appellate counsel. See *Strickland*, 466 U. S. at 697; *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993) (stating that a court may deny an ineffective assistance claim based solely on the absence of prejudice arising from counsel's alleged deficiencies). Because Lewis cannot prevail on his ineffective assistance of appellate counsel claim, his claim that the trial court erred in denying his request to charge on voluntary manslaughter remains procedurally defaulted, and the habeas court erred in granting him relief on that claim.

---

[3] The State's evidence, including the blood evidence, indicated that the entire attack occurred in the room where Ms. Lewis' body was discovered. Epps and Ms. Lewis had been in the bedroom past this room prior to the attack.

V. *Prosecutorial Misconduct and Trial Court Error*

The warden contends the habeas court erred in granting Lewis habeas relief based on his claim of several instances of prosecutorial misconduct and trial court error in connection with that alleged misconduct.

A. *Prosecutorial Misconduct*

The habeas court found the prosecutor committed misconduct when he (1) elicited victim impact testimony from Kellee Dunn during the guilt/innocence phase, (2) vouched for Kellee's truthfulness during his closing argument, (3) made several references to Lewis' case being like "the O. J. Simpson situation" during his opening statement and closing argument, and (4) made an improper "golden rule" argument. Because Lewis did not object to any of the challenged remarks at trial or raise them on direct appeal, these claims of prosecutorial misconduct are barred by procedural default unless Lewis can satisfy the cause and prejudice test. See *Todd*, 268 Ga. at 824 (2) (a); OCGA § 9-14-48 (d).

The habeas court stated summarily in a footnote of its order that the ineffective assistance of appellate counsel "in failing to raise claims of prosecutorial misconduct" on appeal constituted cause to excuse any procedural default of these claims. See *Todd*, 268 Ga. at 824-829 (2) (a), (b) (a successful ineffective assistance claim satisfies both prongs of the cause and prejudice test). In the body of its order, the habeas court also labeled trial counsel deficient for failing to object to the allegedly improper conduct. However, regardless of whether the habeas court found that Lewis had overcome procedural default by establishing the ineffective assistance of appellate counsel in not directly raising and litigating the allegedly improper conduct in Lewis' direct appeal or in not raising and litigating trial counsel's ineffectiveness in failing to object to the allegedly improper conduct in Lewis' direct appeal, we conclude the habeas court erred. In either case, Lewis did not establish ineffective assistance of counsel, and therefore, he failed to satisfy the cause and prejudice test to overcome procedural default.

(i) *Alleged Victim Impact Testimony in the Guilt/Innocence Phase*

Kellee Dunn was the State's key witness because of her eyewitness identification of Lewis as her mother's assailant. The habeas court found the prosecutor improperly elicited victim impact testimony from Kellee during the guilt/innocence phase. See *Lucas v. State*, 274 Ga. 640, 643 (2) (b) (555 SE2d 440) (2001) (error to allow improper reference to victim impact in testimony of guilt/innocence phase witnesses). However, not all testimony that describes how the crime has affected the victim is impermissible in the guilt/innocence phase. " '[D]etails of context that allow [jurors] to understand what is

being described' . . . are not improper in the guilt/innocence phase when they are necessary to show something sufficiently relevant." (Citations omitted.) Id.

A review of the trial transcript shows the State elicited the challenged testimony from Kellee on re-direct examination after Lewis' trial counsel questioned her extensively on cross-examination regarding to whom she had spoken about events the night her mother was killed. Trial counsel asked Kellee about any interviews with investigators and any conversations with family members, including her brother Sean, in an apparent attempt to discredit her direct examination testimony, particularly her eyewitness identification of Lewis as her mother's assailant. During cross-examination, Kellee testified she had never spoken to Sean about the night their mother was killed, the last time she had seen Sean was almost two years ago, she seldom spoke to Sean on the telephone, and she had talked with only one family member about her mother's death.

To put Kellee's responses in context, the prosecutor elicited testimony from her on re-direct examination about "all the people" she had spoken with regarding the events surrounding her mother's death. Kellee testified she was taken to the police station after her mother's death and then to an emergency shelter, where she spoke with therapists. Kellee explained it "upset" her to talk about the night her mother was killed because she felt "bad" as a result of no longer having a mother and that this affected her ability to talk with other people about that night, although "all kind[s] of people" tried to talk to her about it. She also testified she was not living with any family members but in a foster home, which explained her minimal contact with Sean and other family members.[4] Under the circumstances, the prosecutor's questioning and Kellee's testimony were not improper. See *Butts v. State*, 273 Ga. 760, 767 (15) (546 SE2d 472) (2001). Thus, Lewis cannot show the ineffectiveness of appellate counsel in failing to raise on direct appeal the alleged impropriety of this conduct. Moreover, any objections at trial would have lacked merit, and "[f]ailure to make a meritless objection cannot be evidence of ineffective assistance." *Hayes v. State*, 262 Ga. 881, 884-885 (3) (c) (426 SE2d 886) (1993). Therefore, Lewis also cannot show the ineffective assistance of appellate counsel in failing to raise and litigate trial counsel's ineffectiveness on direct appeal.

---

[4] The prosecutor also asked Kellee, "And I just want to make sure the jury understands this, have you had a difficult time after this [your mother's killing]?" However, the question was withdrawn when defense counsel objected on the ground that it was leading.

## (ii) *Vouching for Kellee's Truthfulness*

The habeas court also found the prosecutor committed misconduct by vouching for the truthfulness of Kellee's testimony when the prosecutor in closing argument told the jury that Kellee's testimony was "obviously compelling," it was "obviously truthful," and there was no suggestion "that she would make this up for any reason."

"It is improper for counsel to state to the jury counsel's personal belief as to the veracity of a witness; however, it is not improper for counsel to urge the jury to draw such a conclusion from the evidence." (Citation omitted.) *Metts v. State*, 270 Ga. 481, 484 (4) (511 SE2d 508) (1999). The habeas court found the prosecutor's statement that Kellee's testimony was "obviously truthful" was not based on the evidence and that the prosecutor did not explain why her testimony should be believed. However, a review of the allegedly improper remarks in context shows that, prior to the State's argument, the defense urged the jury numerous times in closing argument to find Kellee's testimony unreliable. Trial counsel argued Kellee's testimony was inconsistent with the investigator's testimony at the preliminary hearing and implied Kellee and her brother had collaborated on their testimony and Kellee had been untruthful when she testified that she had not spoken to Sean about their mother's killing. Trial counsel also argued that Kellee was hysterical at the time and that "[t]he power of suggestion can be overwhelming to a child," and he suggested that Kellee did "not see what happened and now being told [that] it had to have been [Lewis]," she had become convinced that Lewis had been her mother's assailant. The State was entitled to respond to defense counsel's remarks. See *Morgan v. State*, 267 Ga. 203, 204 (1) (476 SE2d 747) (1996).

In doing so, the prosecutor told jurors the trial court would instruct them regarding how to assess the reliability of eyewitness identification, and he informed jurors of several factors that the trial court would charge them were permissible to consider in assessing the reliability of eyewitness identifications, such as the witness' opportunity to view the alleged perpetrator.[5] Then the prosecutor indicated that going through the process of applying those factors to the evidence would "reinforce how compelling Kelly [sic] Dunn's testimony was," because, as he explained:

> I think as you go through almost everyone [sic] of the [factors] you can think of instances of this case that have constantly reinforced [Kellee]. I mean, of course, you get to judge Kelly [sic] Dunn based upon her testimony which was

---

[5] See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2d ed.), p. 39.

obviously compelling, which was obviously truthful, there's no suggestion that she would make this up for any reason. But those are [the] kind of things that can help you in your head and . . . certainly that is why the State has presented so much evidence to you so you know what's going on here.

A review of the challenged statements in context shows that the prosecutor was not offering his personal belief about Kellee's veracity but, instead, was arguing, based on the evidence presented and the reasonable inferences drawn therefrom, that the jury should conclude she was telling the truth. Accordingly, the prosecutor's comments here were not improper. See *Manley v. State*, 284 Ga. 840, 844-845 (2) (b) (672 SE2d 654) (2009) (prosecutor's comments in rebuttal to defense counsel's closing argument did not constitute opinion about veracity of witnesses); *Mason v. State*, 274 Ga. 79, 80 (2) (b) (548 SE2d 298) (2001) (prosecutor's argument that witness is "telling you the honest truth" was not improper, where it was the conclusion the prosecutor wished for the jury to draw from the evidence). Thus, Lewis cannot show the ineffectiveness of appellate counsel in failing to raise on direct appeal the alleged impropriety of this argument. Moreover, any objections would have been meritless, and "the failure to make a meritless objection will not provide support for finding trial counsel ineffective." *Nations v. State*, 290 Ga. 39, 44 (4) (d) (717 SE2d 634) (2011). Therefore, Lewis also cannot show the ineffective assistance of appellate counsel in failing to raise and litigate trial counsel's ineffectiveness on appeal.

(iii) *References to O. J. Simpson*

The habeas court found the prosecutor's references to O. J. Simpson in his opening statement and closing argument, including his drawing an analogy between circumstances in Lewis' case and the glove evidence presented in the O. J. Simpson case, were improper because they "served no purpose other than to inflame the passions of the jury." However, "[a]nalogizing a defendant or a defendant's case to another well-known defendant or case is permissible during argument if the analogy is supported by facts in evidence." *Carr v. State*, 267 Ga. 547, 555 (7) (a) (480 SE2d 583) (1997). The State presented testimony that "Lewis threatened [Ms. Lewis] in the presence of a police officer, saying it would be 'this O. J. Simpson situation again' when he got out of jail." *Lewis II*, 277 Ga. at 535 (1). See *Lewis III*, 286 Ga. at 771 (II) (B). The State also presented expert testimony that "probably the perpetrator had something on his hands — gloves, cloth, or something" based on the evidence at the crime scene, including the blood patterns on the walls. While Kellee could not

recall whether Lewis was wearing gloves when she saw him attacking her mother, she testified he owned a pair of black "winter type" gloves. Therefore, the prosecutor's comments were reasonable inferences from the evidence and were permissible. See *Gissendaner v. State*, 272 Ga. 704, 712 (9) (532 SE2d 677) (2000) (counsel may argue reasonable inferences from evidence).

Accordingly, Lewis cannot show the ineffectiveness of appellate counsel in failing to raise on direct appeal the impropriety of these remarks. Furthermore, "a failure to object to permissible arguments cannot establish deficient attorney performance." *Ford v. State*, 255 Ga. 81, 90 (8) (i) (335 SE2d 567) (1985), vacated on other grounds by *Ford v. Georgia*, 479 U. S. 1075 (107 SC 1268, 94 LE2d 129) (1987). Therefore, Lewis also cannot show the ineffective assistance of appellate counsel in failing to raise and litigate trial counsel's ineffectiveness on appeal.

(iv) *"Golden Rule" Argument*

Finally, the habeas court found the prosecutor made an impermissible "golden rule" argument. "A 'golden rule' argument is one that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position." *Braithwaite v. State*, 275 Ga. 884, 885 (2) (b) (572 SE2d 612) (2002).

Near the end of his argument, the prosecutor laid out the State's theory of the case and in doing so, stated the following:

> [T]hat's when the defendant slaughters her and just starts cutting her and beating her and she's losing a lot of blood. She's losing or *you can imagine, as you're losing the blood you're losing your power* but yet, ladies and gentlemen, she's feeling all that pain and all that suffering, and so that's what's going on.

Pretermitting whether the prosecutor's brief use of the second-person personal pronoun constituted an impermissible "golden rule" argument, we conclude Lewis has not shown his trial counsel was deficient by not objecting to the statement. At the habeas evidentiary hearing, the warden asked trial counsel generally about his decisions to make or not to make objections at trial, and trial counsel testified he objected where he deemed it appropriate. He also stated that, "if it's something that ha[d] just gotten real short shrift [and] something [he] d[id]n't want highlighted," it was a part of his strategy not to "allow" the allegedly improper comments to be repeated "two or three times." Lewis' habeas counsel did not ask trial counsel whether the fact that he did not object to the alleged "golden rule" argument was the result of an oversight or a strategic decision.

In this instance, where the prosecutor momentarily lapsed into the use of the second-person personal pronoun, quickly recovered, and did not again engage in that type of argument, " 'an objection may simply have highlighted the point being made by the prosecution, so we cannot say this was not a valid exercise of professional judgment.' " (Citation omitted.) *Holmes v. State*, 273 Ga. 644, 648 (5) (c) (543 SE2d 688) (2001). Accordingly, the habeas court erred in not presuming that trial counsel's decision not to object to the argument was a strategic decision that did not amount to constitutionally-deficient performance. See *Sweet v. State*, 278 Ga. 320, 326 (8) (602 SE2d 603) (2004) (in the absence of evidence to the contrary, trial counsel's decision not to object to statements in closing argument is presumed to have been strategic); *Braithwaite*, 275 Ga. at 886 (2) (b) (counsel reasonably chose silence as response to State's improper "golden rule" argument).

Because trial counsel's performance was not deficient, appellate counsel could not have prevailed on an ineffective assistance of trial counsel claim. See *Williams v. State*, 281 Ga. 196, 196 (637 SE2d 25) (2006) (petitioner must show both deficient performance and prejudice to establish ineffective assistance of counsel). Furthermore, had appellate counsel raised the "golden rule" issue directly in Lewis' direct appeal, Lewis' contention would have been waived insofar as it concerned the jury's determination of his guilt.[6] See *Gissendaner*, 272 Ga. at 713 (10) (b).

Based on the foregoing considerations, we conclude that Lewis failed to establish ineffective assistance of counsel to satisfy the cause and prejudice test to overcome procedural default of his prosecutorial misconduct claim. Therefore, the habeas court erred in granting him habeas relief here.

B. *Trial Court Error*

The habeas court also granted Lewis relief on the basis that the trial court erred in failing to sua sponte stop the alleged prosecutorial misconduct that is discussed in Division V (A) above. Because Lewis did not raise this claim at trial or on direct appeal, it is barred by

---

[6] Because the habeas court found that Lewis established that he is mentally retarded beyond a reasonable doubt, see *Turpin v. Hill*, 269 Ga. 302, 304 (4) (498 SE2d 52) (1998), and is ineligible for the death penalty, and the warden did not appeal that finding, we need not address whether this allegedly improper statement "in reasonable probability changed the jury's exercise of discretion in choosing between life imprisonment or death." (Citations and punctuation omitted.) *Gissendaner*, 272 Ga. at 714 (10) (b) (stating that, when the death penalty has been imposed, this Court must also consider whether any allegedly improper arguments that were not objected to at trial in reasonable probability affected the jury's exercise of discretion in determining sentence).

procedural default unless Lewis can satisfy the cause and prejudice test. See *Todd*, 268 Ga. at 824 (2) (a); OCGA § 9-14-48 (d).

The habeas court stated summarily in a footnote of its order that Lewis satisfied the cause and prejudice test to excuse any procedural default to this claim by establishing the ineffectiveness of trial counsel in failing to object to the conduct and the ineffectiveness of appellate counsel in failing to raise and litigate on appeal the issue of trial counsel's ineffectiveness. However, as set forth in Division V (A) above, Lewis failed to establish the ineffectiveness of counsel with regard to the allegedly improper conduct, and therefore, Lewis cannot satisfy the cause and prejudice test, and his claim remains procedurally defaulted. Accordingly, the habeas court erred in granting Lewis habeas relief on this claim.

VI. *Cumulative Error*

The habeas court also erred in vacating Lewis' convictions based upon a finding of cumulative error. " '[I]t remains the case that '(t)his State does not recognize the cumulative error rule.' " (Citation omitted.) *Schofield v. Holsey*, 281 Ga. 809, 811 (II), n. 1 (642 SE2d 56) (2007). See *Head v. Taylor*, 273 Ga. 69, 70 (2) (538 SE2d 416) (2000). Moreover, Lewis failed to establish any of his constitutional claims with regard to the guilt/innocence phase of his trial.[7]

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 18, 2012.

---

[7] In concluding that the cumulative effect of constitutional errors deprived Lewis of a fair trial, the habeas court stated that it had "already found Mr. Lewis' counsel were constitutionally ineffective and that finding is final because [the warden] did not appeal that finding to the Georgia Supreme Court." The warden did not challenge the habeas court's finding of *deficient performance* with respect to Lewis' ineffective assistance of appellate counsel claim when the warden appealed the habeas court's vacation of Lewis' malice murder conviction based on appellate counsel's ineffective assistance. See *Lewis III*, 286 Ga. at 770 (II) (A). Thus, this Court assumed that appellate counsel were deficient in failing to raise trial counsel's ineffectiveness, examined the underlying ineffectiveness of trial counsel claim, and determined that the underlying claim would not have had a reasonable probability of success on direct appeal because Lewis failed to establish prejudice. See id. at 783 (II) (D); *Strickland*, 466 U. S. at 687 (holding that an ineffective assistance of counsel claim can succeed only upon a showing of both deficient performance and prejudice of constitutional proportions); *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). Accordingly, we held that Lewis could not prevail on his ineffective assistance of appellate counsel claim, because appellate counsel were not ineffective in failing to raise a meritless ineffective assistance of trial counsel claim, and we reversed that portion of the habeas court's judgment granting Lewis' ineffective assistance of counsel claim. See *Lewis III*, 286 Ga. at 783-784 (II) (D). Therefore, the habeas court erred as a matter of law in concluding that its finding that Lewis' counsel were "constitutionally ineffective" was not appealed and, thus, was final. See *Lloyd v. State*, 280 Ga. 187, 192 (2) (d) (ii) (625 SE2d 771) (2006) (stating that "deficient performance, alone, does not amount to ineffective counsel").

*Samuel S. Olens, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Patricia B. Attaway Burton, Senior Assistant Attorney General, Richard Tangum, Assistant Attorney General,* for appellant.

*Schiff Hardin, Paul E. Greenwalt III, Ann H. MacDonald, Heidi Oertle,* for appellee.